OF THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA.

## SPRING-SPECIAL TERM, 1894.

### CHARLESTON.

DIAL *v.* HOLLANDSWORTH.

Submitted January 16, 1894.—Decided March 19, 1894.

1. ELECTIONS—BALLOT-CLERKS.

    While the election-law requires the ballot-clerks to be of opposite politics, the mere fact that such is not the case is not sufficient alone to justify the exclusion of the poll from the count.

2. ELECTIONS—COMMISSIONERS OF ELECTION—BALLOT-CLERKS.

    If the commissioners of election acting innocently in violation of law appoint two additional ballot-clerks to aid in conducting the election, such misconduct, though a strong suspicious circumstance, is not sufficient to invalidate the poll, unless there is some evidence tending to show that such appointments were corruptly intended to, and did, influence the result of the election.

1

3. ELECTIONS—COMMISSIONERS OF ELECTION.

The return of a poll by the commissioners of election is *prima facie* the true result of the election and will not be reversed by this Court because of misconduct on the part of the election-officers or other persons, unless it plainly appears that such misconduct changed the result of the election.

J. H. FERGUSON for plaintiff in error.

CAMPBELL & HOLT and J. E. CHILTON for defendant in error cited 6 W. Va. 613, 713 ; 27 W. Va. 806.

DENT, JUDGE:

At the general election for state and county officers held in the county of Lincoln on the 8th day of November, 1892, J. M. Dial was the candidate of the People's party, and was indorsed by the Republican party, and J. M. Hollandsworth was the candidate of the Democratic party. On the face of the returns Dial received one thousand and ninety three votes, and Hollandsworth received one thousand one hundred and twenty one votes, which gave the latter twenty eight majority. The canvassers declared Hollandsworth elected. Dial contested. The County Court decided the contest in his favor. Hollandsworth appealed, and the Circuit Court reversed the County Court. Dial then obtained a writ of error to this Court.

This being a case of statutory remedy, and the statute only providing for an appeal to the Circuit Court, it is a serious question whether this Court has jurisdiction to review the judgment of the Circuit Court. While the constitution gives this Court jurisdiction in cases of *quo warranto*, it certainly was never contemplated to turn the Supreme Court into a returning board as part of the election-machinery. But, as this decision will not affect the determination of the Circuit Court, it is unnecessary to pass on the question of jurisdiction, as both litigants prefer a hearing of the matter on its merits.

The only question now presented by the pleadings and evidence in this contest is :  Should the votes cast at precinct No. 1, Hart's creek district be excluded from the canvass of the vote as to the office of sheriff?  If they should be excluded, the result of the election, as ascertained by the can-

vassers, would be reversed in favor of the contestant. The sole ground for asking for the exclusion of these votes was the misconduct of the commissioners of election in appointing two extra ballot-clerks, making four in all, and allowing two of them, both Democrats, to take charge of the booths and fill up all ballots when either called upon or they volunteered acceptably to the voter. No fraud or corruption is proven; but contestant insists, that from the fact, that these ballot-clerks had the opportunity to corrupt the poll, the court must presume they did so and therefore reject the count.

While ordinarily such misconduct unexplained raises grave suspicions, and would require but a small amount of additional evidence to destroy the presumption of fairness and sustain the charge of corruption, yet in this case the officers of the election have given a reasonable, although not a legal, excuse for their conduct, and the contestant has failed to produce any evidence of unfairness tending to sustain the fraudulent practices alleged in the notice of contest. So far as anything in the evidence is contained, it tends to show that there was a free ballot and a fair count as to every vote cast at this precinct. And, while the secrecy of the ballot was not preserved, and the law in that respect was not strictly followed, the result of the vote was apparently the same, as it would have been, if the law had been followed.

The syllabus in the case of *Loomis* v. *Jackson,* 6 W. Va. 613, relating to questions of this kind, is as follows, to wit:

"(11) Many provisions of the law in regard to the manner of holding and conducting the election and counting the votes and certifying the result must be held to be directory only, and intended to point out to inexperienced and ignorant persons who sometimes act as election-officers a plain, easy, and direct way by which they are to attain the great end of their creation, viz. to ascertain the true result of the election. When the true result of the legal election has been ascertained, or can be ascertained, by the officers charged with the performance of the duty, no irregularity, mistake, or even fraud committed by any of the officers conducting the election, or by any other person, can be per-

mitted to defeat the fair expression of the popular will as expressed in said election."

"(13) What irregularities are held to be immaterial? It is affirmed that no irregularity, or even misconduct, on the part of the election officers, or other persons, will vitiate an otherwise legal election, unless the result thereof has been thereby changed or rendered so uncertain as to make it impossible to ascertain the true result. A different rule would make the manner of performing a public duty more important than the duty itself."

There is no good reason why these principles should not apply to the present election-law as well as to any other. The contestant neither alleges nor proves that the result of the election was changed or rendered so uncertain as to make it impossible to ascertain the true result. And yet he wants the court to set aside the election and declare him the choice of the people, for the sole reason that the commissioner, acting out of a too-abundant fear that all the voters would not have an opportunity to vote, and so the right of suffrage be denied them, appointed two additional ballot-clerks to assist in holding the election, and thus unlawfully placed these persons in a position to defeat a fair expression of the popular will, if dishonest enough to do so and willing to risk the chances of confinement in the penitentiary.

Against the honest conduct or upright character of these persons or the contestee there is no evidence except the fact that they were from the same political party or nearly so. What they did was done, as they had reason to believe, in the discharge of a public duty as sworn officers under the immediate surveillance of the lawful commissioners of the election, and no witness casts on them even the shadow of suspicion or doubt. Nevertheless the court must, in the earnest language of the counsel, "put halters around their necks" and presume, because they were in a position to commit a felony, that they did so.

In the language of the law quoted above before we can reject this vote, we must be able to say that by misconduct the "result of the election was changed." It is not sufficient to say that it is possible that it might have been

changed, for that would not justify action on our part, but would be an arbitrary subversion of the popular will on mere suspicion.

In the able opinion of Judge WOODS in the case of *Loomis* v. *Jackson, supra,* authorities bearing on the question here raised are cited to the following effect, to wit: "The following irregularities have been held to be immaterial: Where the inspector acted as clerk, and where more than the lawful number of inspectors acted at the election (*People* v. *Cook,* Brightly, Elect. Cas. 452); where the clerk assumed the place of an absent inspector (*Thompson* v. *Ewing,* 1 Brewst. 69); where one of the clerks during the election became so much intoxicated as to be unable to continue his labors, and another person was called, who acted in his place without being sworn, until the regular clerk was able to resume his labors (see *Boileau's Case,* Brightly, Elect. Cas. 268; *People* v. *Cook, Id.* 452); where the election officers being illiterate called in a person, who was not an election-officer or clerk, to take the ballots from the box and read them to the tellers at the invitation of the election-officers (see *Sprague* v. *Norway,* 31 Cal. 175); the omission of the inspectors while counting the votes to take out the ballots deliberately from the boxes, and read aloud the names printed thereon (*Skerrett's Case,* 2 Pars. Eq. Cas. 515); and, lastly, the omission of the judges or clerks of an election to sign the poll-books, to fill up blanks in the caption, or to state the aggregate number of the votes, all which may be corrected by parol and, when corrected, used as competent evidence of the result of the election (*Powers* v. *Reed,* 19 Ohio St. 189)." See, also, Mechem, Pub. Off. §§ 222—224, p. 143.

To permit the misconduct, innocent or otherwise, of election-officers or other persons to furnish a sufficient excuse to overturn the expressed will of the people would be setting an extremely dangerous precedent, and would be far more disastrous to popular suffrage than to allow the result of an election to stand which has been fairly ascertained by sworn officers, whose integrity is unimpeached, although they may have been innocently guilty of the grossest irregularities in disregard of the plain requirements of the law.

The burden of proof in election contests, as in all other cases of alleged fraud, is on the contestant, who must establish it by a preponderance of testimony. Failing to do so the courts can afford him no relief, for otherwise they lend their aid to subvert what it is their duty to maintain, and become at best merely returning boards.

An abiding confidence in the patriotism, obedience to law and love of justice of the citizens of this state without regard to political affiliations lead us to believe that the evil prognostications of contestant's counsel will prove groundless, and that the election-law, when its wise provisions are fully comprehended, will be faithfully carried out, notwithstanding the result of this litigation.

But, however this may be, our conclusion is, that there is no sufficient reason shown to justify us in setting aside the result of the election as ascertained by the canvassers and ratified by the judgment of the Circuit Court, which is therefore affirmed.

---

BRANNON, PRESIDENT, (*dissenting*).

OFFICERS DE JURE AND DE FACTO—STATUTES MANDATORY AND DI-
RECTORY—IRREGULARITIES IN ELECTIONS.

I dislike to differ with the majority of the court, but my views of the recently passed election law, its spirit, design and future usefulness, are such, and the points in which its provisions were violated in this case are so vital to its efficacy in future, and the decision tends to tolerate such looseness in its execution, and the questions involved in the case are of such general importance, that I can not give my assent to that decision.

At the election in 1892, J. M. Dial and J. M. Hollandsworth were candidates for sheriff in Lincoln county. By the returns Hollandsworth received one thousand one hundred and twenty one votes; Dial one thousand and ninety three votes. The board of canvassers declared Hollandsworth elected. Dial then instituted a contest for the office, and the County Court declared Dial elected by the rejection of the vote cast at precinct No. 1, in Hart's Creek district, where Hollandsworth received one hundred and forty eight

votes and Dial fifty seven, and, upon appeal to the Circuit Court, the decision of the County Court was reversed, and Hollandsworth given the office, and Dial brought the case here by writ of error.

Hollandsworth by counsel makes the point, that the notice is insufficient; but we regard it sufficient. This question involves no important principle of law, being only a question whether the notice comes up to the conceded legal standard, and it is not important to discuss it. The notice is based on illegality of the election.

At the opening of the polls at precinct No. 1, Hart's Creek district, Holton and Greer were appointed poll-clerks by the commissioners of election, as directed by section 8, c. 3, Code 1891, and qualified and acted as such. About one o'clock, on the claim that it was necessary to do so to allow all voters to vote, the two commissioners chosen from one political party against the objection of the third, appointed two additional poll-clerks, Brumfield and Fowler; from opposite parties, and they were sworn and until the closing of the polls acted as such, Holton and Greer, the two poll-clerks first appointed, still remaining and acting in the election, recording the names of voters. Brumfield, one of the additional poll-clerks, and Holton, one of the first appointees, acted all the afternoon in aiding voters to prepare tickets, and were constantly occupied, as, from illiteracy or because of the newly introduced method of voting, more than three fourths of the voters received their aid. Both Brumfield and Holton were of the same political party, and were appointed as such. These two poll-clerks did not both go into a booth with a voter to prepare his ballot, but only one went in; one seeming to attend to one, the other to the other, of the two booths. Up to the time when these extra clerks were appointed there had been polled seventy four votes, and after they were appointed one hundred and thirty four were polled.

Here we have the fact that two persons were appointed and acted during the casting of the greater number of votes cast at the precinct as extra clerks, when the two regularly appointed clerks were still present. What is the legal effect of that fact upon the validity of the election at that precinct? Does it vitiate and exclude it from the count?

Section 8, c. 3, of the Code, empowers the commissioners of election to appoint two poll-clerks. Whence came their authority to appoint more? The legislature limited them to this number, without a hint of discretion, even for necessity, not to say on a mere supposition that it is necessary in order to poll the vote to appoint more. These commissioners are officers of limited authority, with the chart for their action fixed by the statute, without discretion to do this act. Their appointment was void because unauthorized, void because against the law, and void because the offices of the two poll-clerks were filled, and there can be no appointment to an office already filled. We therefore can not treat them as officers *de facto,* as there was no power to appoint them, since Holton and Greer were in office, and there can not be an officer *de facto* when there is an officer *de jure* in possession. Mechem, Pub. Off. § 322; *Boardman* v. *Halliday,* 10 Paige, 223; *Hamlin* v. *Kassafer,* 15 Or. 456 (15 Pac. 778); *McCahon* v. *Commissioners,* 8 Kan. 437; *Cohn* v. *Beal,* 61 Miss. 398.

As said in the Kansas case, when an office is to be held by one person, two can not hold it as tenants in common (*Morgan* v. *Quackenbush,* 22 Barb. 80); and the court said, as the regular county commissioners were in office *de facto et de jure,* there was no room for other *de facto* commissioners. An officer *de jure* has lawful title, but is not in possession; an officer *de facto* is one who is in possession of the office, acting, but has not good title; a usurper is one who assumes to act without title, without even color of title. But here the first appointees were *de jure et de facto* clerks, and then there could be no *de facto* clerk.

I am aware of the doctrine, that, in order to sustain the acts of public officers in favor of the public, and especially to sustain and validate elections by the people, the courts hold good such acts, though done by officers not lawfully appointed, treating them as officers *de facto;* but I can not think that doctrine applies in this instance. We need not enter largely into the nice distinctions and principles relating to the question of when an officer is one *de facto* or a mere intruder or usurper; for here are the two lawful poll clerks in office, present at the polls, leaving no office vacant,

and two others are appointed to these offices. The act of appointment was void, and the appointees not poll-clerks, but usurpers. What else can they be? What, then, is the legal effect of the participation of these extra clerks in the election? Here I concede the principle that, generally, mere irregularity in the conduct of an election will not render it void and abortive, and disfranchise voters, and defeat the popular will, and that provisions of election-acts regulating the manner of holding elections, and ascertaining and certifying results, are usually regarded as directory not mandatory, and that the acts of election officers are, as a general rule, held good as acts of *de facto* officers, although their appointment or authority be irregular and defective; but still the law is that an election, to be valid, must not be held by anybody indifferently, but by some one having some color of legitimate authority, so that we can call him an officer *de facto*. A mere usurper can not hold an election. *People* v. *Cook*, Brightly, Elect. Cas. 451; *State* v. *Taylor*, 108 N. C. 196 (12 S. E. 1005); note on page 752 of 83 Am. Dec. in case of *People* v. *Bates*, giving the law on many important points relating to elections.

In Georgia a statute required a justice to preside at a constable's election. He acted part of the day, as did the lawful clerks in our case. The election was held void. *Franklin* v. *Kaufman*, 65 Ga. 260. See, as to who are officers *de jure* and *de facto*, and usurpers: *Monteith* v. *Com.*, 15 Gratt. 172; *Griffin* v. *Cunningham*, 20 Gratt. 31; *McGraw* v. *Williams*, 33 Gratt. 513. So, we have a case not simply of an election irregularly conducted, or in which a colorable officer took part, but one held in part by officers not colorable officers, when the law says that an election can not be held by such officers.

But are the facts and principles just stated sufficient to exclude the precinct in question? There were lawful officers at the election; in fact all were there—commissioners, challengers, and clerks. Then, does the part which the two unlawful poll-clerks took in the election poison it and exclude the precinct?

Brumfield extensively, constantly participated by going alone, without any other poll-clerks, into the booths, and

preparing tickets for dozens of illiterate voters. So did Holton, but likely not with so many voters. This was the uniform course during the casting of one hundred and thirty four out of two hundred and eight votes. Here we have three facts : First, the participation of a poll-clerk, who was no poll-clerk, as the only one preparing very many ballots cast by voters ; and, second, that both clerks were not present together when they were so prepared, but the ballots were the work of only one clerk ; and, third, both these clerks were of one party, and voted for Hollandsworth— whereas section 60, c. 3, Code 1891, provides that a voter, who can not prepare his ballot, may declare his choice of candidates to the poll-clerks, "who, in the presence of the voter and in the presence of each other shall prepare his ballot for voting in the manner heretofore provided, and on request shall read over to such voter the names of the candidates on the ballot as so prepared."

The function of poll-clerks is separate and apart from the other officers of election, wholly distinct from them. Can we say that the function performed by poll clerks in preparing for the helpless, illiterate voter the very ballot that tells his will, the only thing which the law allows to speak his will—are we to say this function is of minor, not vital, importance ? Can we say that the statute, in requiring both clerks present in this most important act, is simply directory, not mandatory—that it is merely directory— when in section 8 it commands that the poll-clerks shall be taken from opposite political parties ? It is a dangerous power, at best, to commit to any one not chosen by the voter himself, from bosom friendship or relationship or political fellowship, the preparation in secret of his ballot, but a necessary one under the system adopted by the act of March 11, 1891, called the "Australian Election-Law ;" and the legislature has with sedulous care provided these and many other guards of safety to preserve the sanctity of the freeman's suffrage, and to secure purity and prevent corruption of elections.

So common and flagrant and dangerous throughout the nation had become the corruption of the ballot, that ballot reform became the earnest and anxious impulse of the peo-

ple and legislatures in all the states, which resulted in the radical amendment of former laws and the adoption of the system called the "Australian Election-Law," the vital purpose of which was to secure to every voter a ballot reflecting his true vote, and guard the illiterate voter against the falsification of his ballot. This highly commendable purpose, among others, is spoken by the labored provisions of detail, the guarded and carefully chosen language, the severe penalties, with which the act bristles, visited upon every act of corruption of the ballot by election-officers and others, and the entire spirit of the act.

The features relating to this case, to which I have adverted above, show that the lawmakers intended, not to put the illiterate voter's ballot in the hands of one clerk in secret, but to increase his safety by the presence of two. Fraud could be perpetrated with impunity if but one clerk and the voter incompetent to read should be alone in the secret booth, but few indeed would commit a felony with other watchful eyes upon them, especially the eyes of a political adversary. These provisions are the very core of the protection afforded by the act to illiterate voters, who, unfortunately, are numbered by thousands. I can name none more essential, more important, in the whole process of holding elections. It is the only citadel of safety of that class of voters—the only class needing help—and of candidates and of the public.

As was said in *People* v. *Board of County Canvassers of Onondaga Co.*, 129 N. Y. 395 (29 N. E. 327), in discussing the New York ballot-reform-act, if the courts, under the idea that in these matters the statute is only directory, fritter away the most essential provisions, they defeat the legislative design and the public policy of late years of ballot-reform and betterment of elections, on which the highest interests of government rest. That this new election-law has many provisions simply directory is true; but it has many others mandatory, necessarily to be regarded mandatory, in order to remedy the evils sought to be cured by its enactment. Judge Cooley, in Constitutional Limitations (page 618) quotes as a very satisfactory general rule, what I notice is often quoted approvingly in

books and decisions, the ruling in New York in *People* v. *Cook*, 14 Barb. 259, and 8 N. Y. 67, which is:

"Any irregularity in conducting an election which does not deprive a legal voter of his vote, or admit a disqualified person to vote if it cast no uncertainty on the result, and has not been occasioned by the agency of a party seeking to derive a benefit from it, may be overlooked in an action in the nature of a *quo warranto*" (6 Am. & Eng. Enc. Law, 325).

Try the present case by this rule. Can we say that the act of an unlawful clerk without color of authority to act, in preparing alone dozens of tickets in secret with no eye to overlook his action casts no uncertainty over the result at this precinct? Can we say that the action of the two poll clerks in preparing more than one hundred tickets in secret booths, with no detective eye, casts no uncertainty over it? Gross irregularity it was, aside from the fact that one clerk was no clerk, and, before we can call it harmless, we must, under the above rule, be able to assert with confidence that it did no harm. It may be that these officers acted with the utmost honesty; it is not necessary to predicate the decision on the affirmative assertion that they falsified ballots, but neither can we assert that they did not. If we say that a great number of ballots can be prepared for illiterate voters in the booths by one poll-clerk in the absence of the other, and that the only clerks acting therein may both be of the same political party, what becomes of the command of the legislature that two clerks of different politics shall be present? This would be carrying the doctrine of directory statutes to the nullification of legislative enactment touching the very soul of the purity of the ballot. We can not be told that, while the law does make such provisions, it yet does not say that departure from them shall invalidate; for a statute may be mandatory, not only where it contains negative words, but also from its spirit and purpose and the point wherein there is a violation of its provisions; it may be mandatory not only in its language, but also by fair implication. We should construe the act as declaring that ballots of illiterate voters shall be prepared by two poll-clerks of different politics, present at the same time, and as prohibiting any other mode of preparation.

In *State* v. *Russell*, 34 Neb. 116, (51 N. W. 465) it is laid down that "when a statute, expressly or by fair implication, declares any act to be essential to a valid election, or that an act shall be performed in a given manner and no other, such provisions are mandatory and exclusive."

If a statute expressly declares any particular act to be essential to the validity of an election, or that its omission shall render the election void, the courts, whose duty it is to enforce the law as they find it, must so hold, whether the particular act in question goes to the merits or affects the result of the election or not; for such a statute is mandatory, and the court can not enter into the question of its policy. On the other hand, if a statute simply provides that certain things shall be done within a particular time or in a particular manner, and does not declare that their performance shall be essential to the validity of an election, they will be regarded as mandatory, if they affect the merits of the election, and as directory only, if they do not affect its merits. I consider this a correct statement of law, and it is supported by *Parvin* v. *Wimberg*, 130 Ind. 561 (30 N. E. Rep. 790); *Gilleland* v. *Schuyler*, 9 Kan. 569; *Barnes* v. *Board*, 51 Miss. 305; McCrary, Elect. § 190.

In *Juker* v. *Com.*, 20 Pa. St. 493, it is conceded that, if the irregularity tend to affect results, it avoids the vote; and in *Thompson* v. *Ewiny*, 1 Brewst. 67, it is said that the whole conduct of the officers (though actual fraud be not apparent) may amount to such gross and culpable negligence, such a disregard of official duties, as to render their doings unintelligible or unworthy of credence, and the results of their action unreliable for any purpose.

In *Piatt* v. *People*, 29 Ill. 72, it is admitted that, if the irregularity cast uncertainty on the result, it is fatal. In reason and common sense, aside from authority, it must be so. In section 207, McCrary, Elect., the true rule is laid down from *Duffy's Case*, 4 Brewst. 531: "In the case of Duffy the court laid down the rule that incompetency, inefficiency and a reckless disregard of essential requirements of the law on the part of officers conducting an election, to such an extent as that their acts become unreliable, must of necessity work the same result as actual fraud."

The case of *Loomis* v. *Jackson,* 6 W. Va. 613, was not under such a rigid statute as the late election act, and did not concern misconduct in the election of so vital a character as is involved in this case ; and even that case, with all its liberality in overlooking irregularities, concedes in point thirteen that, if the irregularity render the result uncertain, it can not be overlooked.

Perhaps no better concise rule has ever been given on the subject than that by Lord Mansfield in *Rex* v. *Loxdale,* 1 Burrows, 447, that the question whether a given statutory provision is mandatory or directory depends on whether that which is directed to be done is or is not of the essence of the thing required.

In *People* v. *Shermerhorn,* 19 Barb. 558, the Supreme Court of New York said statutory provisions are deemed directory only when they relate to some immaterial matter, where a compliance is matter of convenience rather than of substance. See Cooley, Const. Lim. 75.

Lord Campbell speaking of the many cases bearing on the definition of mandatory and directory statutes, said : "I believe, as far as any rule is concerned, you can not safely go further than that in each case you must look to the subject-matter, consider the importance of the provision, and the relation of that provision to the general object intended to be secured by the act, and, upon a review of the case in that aspect, decide whether the enactment is what is called imperative or directory." *Howard* v. *Bodington,* 2 Prob. Div. 211 ; Suth. St. Const. § 447.

Was it not the special purpose by the provision for two clerks of opposite parties to prepare ballots to guard the voter against fraud, and thus secure an expression in the election of the real popular will, and give the candidate who is the choice of the majority his office? When we look at the importance of the provision, and see how intimately it concerns the main purpose—a fair election reflecting the people's will—we can not help concluding that these provesions are imperative. How can we say that plain requirements to protect voter, candidate, and public are trivial and only directory? Courts should be cautious in declaring provisions of the reformed ballot-act, seeing

the great ills they were designed to remove, and the desirable ends to be subserved, to be merely directory. We must not loose the reins and curbs made by the law against fraud upon the ballots of the illiterate, else the steed will run away with us. They relate to the very essence of the purity of elections.

One fact single and alone is enough to set aside this precinct, and that is the fact that many ballots were prepared by a person not a poll-clerk, without color of authority. They were mere nullities, not ballots. They were not prepared by the voter, nor by two poll-clerks, not even by one. Should ballots prepared by any one, no matter by whom, be counted? I think not. Then, why count these? For which of these candidates such ballots were voted we know not—can not know. They leave the result in a fog of uncertainty. It requires a great stretch of liberality to overlook these things, a liberality endangering the usefulness of the statute.

But it may be said that though some of the officers acting in the election were no officers, and conceding that the statute directions as to the presence of two clerks in the preparation of ballots are imperative, still the complaining candidate must show that ballots were falsified, and just how many and whose ballots were falsified. This is not so. He has the right under the law to immunity from danger. To require him to specify would impose a duty on him impossible of performance. How can he know whose ballots were corrupted? The ballot must not bear the slightest earmark to point to its depositor. The secrecy of the ballot is sacred. The illiterate voter can not inform the wronged candidate, because that voter does not know, and the clerk will not expose an act which will commit him to the penitentiary, and the other clerk was not present. Once establish the doctrine that the complaining candidate must show fraud or falsification of ballots, and you give immunity to fraud. It makes no difference how gross the departure from the conduct of the election as required by law, it is harmless error only; it is presumed that nobody was hurt until[1] proven. It is a free pass to fraud on the ballot, because the crime is hidden safely under the secrecy of the ballot,

beyond proof or specification, in a great majority of cases.

Under the decision in this case, upon the evidence of the poll clerks alone, the purity of the election is established. Upon this principle, in any election, the very men who plan and perpetrate fraud upon the ballot may by their evidence make their fraud triumphant, and there is no evidence possibly obtainable to repel it and sustain the law. Under this construction, the prime objects of the late statute may be frustrated. If such irregularity as exists in this case will not sustain the charge of illegality of an election, I think it would be difficult to specify one that would. Here the objection is to the legality of the election, not to particular votes. Where the contest is based not on that but on a challenge of votes, of the votes specification is necessary; but, where it is based on illegality of the election, the statute and reason require no specification of votes, but only grounds on which the charge of illegality rests. Code 1891, c. 6, s. 1.

"While mere irregularity, which does not affect the result, will not vitiate the return, yet where the provisions of the election-law have been entirely disregarded by the officers, and their conduct has been such as to render their returns utterly unworthy of credit, the return must be rejected. In such a case the returns prove nothing." McCrary, Elect. § 476.

As showing how one thing may from its importance vitiate, while another will not, suppose we say that the action of Fowler, one of the extra clerks, in recording names of voters, would not hurt, because of the nature of the work he did, and because his record was tested by a duplicate, and under the eyes of the commissioners; but the nature of the work of a poll-clerk preparing ballots is of a wholly different cast, and there was nothing to correct it by, and no one to discover it.

It is charged, in behalf of Dial, that the appointment of extra clerks was on a mere pretext of necessity, and it would seem from the number of votes polled before their appointment at the noon recess and the number afterwards that there was no necessity. It is charged that one of the extra clerks was chosen because a partisan of Hollandsworth, and

two clerks of his party were put to the work of preparing ballots, and that these clerks were eager in their office, and would go unasked into the booths with voters, and often volunteer their services when not asked. The record does not make a showing above reproach in these matters, but gives evidence tending to sustain these claims. Still, the appointment of these clerks may have been *bona fide*, and their entire action likewise. But the letter and spirit of the new and valuable election-law, made designedly rigid and exact as to the conduct of election, were violated, the door of wrong left open, the true result left uncertain and unreliable, to say the least. I would therefore reverse the Circuit Court, and affirm the County Court, declaring Dial elected by the exclusion of Hart's Creek precinct.

Circuit Court affirmed.