# CHARLESTON.

SNODGRASS v. WETZEL COUNTY COURT.

Submitted June 11, 1897—Decided November 20, 1897.

ELECTIONS BY THE PEOPLE.

Error to Circuit Court, Wetzel County.

*Certiorari* by R. E. L. Snodgrass to review the decision of the board of canvassers of Wetzel County that A. R. Thompson was elected clerk of the county court. From a decree in favor of Thompson, plaintiff brings error.

*Affirmed by divided Court.*

ROBT. McELDOWNEY, W. G. SNODGRASS, C. A. SNOD-GRASS, AND H. P. CAMDEN, for plaintiff in error.

BASIL T. BOWERS, for defendant in error.

BRANNON, JUDGE:

At the late election in Wetzel county Snodgrass and Thompson were competing candidates for clerkship of the county court, and the county commissioners declared Thompson elected, and Snodgrass obtained a writ of *certiorari* from the circuit court to review and reverse the proceedings of the commissioners acting as a board of canvassers, and the circuit court decided the case in favor of Thompson, and Snodgrass brings the case here upon a writ of error. Before the board of canvassers Snodgrass asked the court to reject Grant precinct for the reason that the poll clerks divided the sheets on which the ballots

were printed, and, instead of each man writing his own name on the backs thereof, each wrote not only his own name, but that of his associate poll clerk. The question, then, is whether that act of the poll clerks, done in the room where the election was held, on the day of the election, in the presence of the other officers of the election, and in the presence of each other, and by the agreement of both of them, shall cast out Grant precinct. I answer, "No." The statute (Code 1891, p. 70, s. 36), speaking of the ballots, says: "On the back of each sheet of paper on which the ballots are printed and as near the center thereof as may be shall be printed the words 'Poll Clerks' and under them each poll clerk shall write his name before the ballot is delivered to the voters, and the sheet containing the ballots shall be so folded as to show the words 'Poll Clerks,' and the signatures of said clerks written thereon, before depositing the same in the ballot box." It is contended that each clerk must, with his own hand, subscribe his name. A poll clerk is purely a ministerial officer, and the act of signing is a ministerial act. "In general, all ministerial duties which the principal himself has a right to perform may be discharged by a deputy. Judicial duties cannot." 5 Am. & Eng. Enc. Law, 624. "Where the duties of a public officer are of a ministerial character, they may be discharged by a deputy." 19 Am. & Eng. Enc. Law, 462. A deputy may be appointed by parol. Mechem, Pub. Off. § 568; Throop, Pub. Off. § 577. "A public officer may delegate to a deputy the right to subscribe the name of his principal." *Abrams* v. *Ervin,* 9 Iowa, 87; *Com.* v. *Arnold,* 3 Litt. 315; 19 Am. & Eng. Enc. Law, 462, note 2. In *Downing* v. *Rugar,* 21 Wend. 178, it was held that, where two overseers of the poor must both act together, one might, by consent of the other, act, even in his absence, alone, as the agent or deputy of both. And Code, c. 13, s. 16, says: "When a statute requires an act to be done by an officer or person it shall be sufficient if it be done by his agent or deputy, unless it be such as cannot lawfully be done by deputation." Now, if we were to test the act involved in this case of the signatures of the poll clerks by the principle of the common law relating to authority of public officers to act by agent or deputy, the

act would be sustained, and it is not clear that we might not so test it; but I merely mention these principles as corroborative of other reasons I shall give for sustaining this act. Really, it is not a question of agency or deputation, for here the poll clerks were facing each other at the election room, and the one authorized the other to sign his name, and it was done in his presence, and by his consent. They separated the ballots into two bunches, and for speed in indorsing their names, signed as I have said. Each signature was in law the act of him whose name it bore, because done in his presence, and by his authority. It does not raise the question whether one could, in the absence of the other, by his authority, thus sign his name. Take the case of signing deeds and other writings required to be signed by the party under the statute of frauds. It is settled law that if one person, standing by another, authorizes him to sign his name, it is not an act of agency, but is regarded as the very signature of the very party himself, as if done by himself. Chief Justice Shaw said in *Gardner v. Gardner*, 5 Cush. 483: "The name being written by another, and in the presence of the grantor, at her request, is her act. The disposing capacity, the act of mind, which are the essential and efficient ingredients of the deed, are hers, and she merely uses the hand of another, through incapacity or weakness, instead of her own, to do the physicial act of making a written sign." So speak the authorities generally as to deeds. Browne, St. Frauds, §§ 10—12; Wood, St. Frauds, § 16. Why shall we not apply the same reasoning in the case of a poll clerk signing under these circumstances? The signature of the one, done in the presence of the other, by his direction, is his own signature. The only purpose of requiring the poll clerk's indorsement is to make an earmark by which the officers of the election can tell whether the ballot handed them by the voter is the genuine official ballot, as they see the poll clerk's signature thereon. Now, there is no whisper in this case that these ballots are not the genuine official ballots used at the election. There is no suggestion from any quarter that they are spurious or false in any respect, or are not the true expression of the will of the voter. There is no proof that the ballots are

counterfeit, or that the signatures on them are not the true signatures of the poll clerks, made in the manner stated. Wherein, then, do these signatures fail to perform the function which they are designed to perform just as well as if each clerk had signed his own name? Are we to defeat the popular will, reverse the decision of both the county and circuit courts, for a reason so barren of reason? I cannot thus lightly overthrow the popular will, and deprive a party, plainly elected by the popular verdict, of his office.

In *Dial* v. *Hollandsworth*, 39 W. Va., 1, (19 S. E. 557,) JUDGE DENT said, after speaking of principles of liberality applied by the courts to sustain fair elections: "There is no good reason why these principles should not apply to the present election law as well as any other. The contestant neither alleges nor proves that the result of the election was changed, or rendered so uncertain as to make it impossible to ascertain the true result." We have this same election law and Australian ballot involved in this case. He further said: "To permit the misconduct, innocent or otherwise, of election officers or other persons to furnish a sufficient excuse to overturn the express will of the people would be setting an extremely dangerous precedent, and would be far more disastrous to popular suffrage than to allow the result of an election to stand which has been fairly ascertained by sworn officers, whose integrity is unimpeachable, although they may have been innocently guilty of the grossest irregularities, in disregard of the plain requirements of the law." And that case held that, to overthrow an election for irregularity the burden is upon the party who would do so to establish the unfairness of the election, unless it plainly appears that the irregularity changed the result of the election; and the court and the opinion of JUDGE DENT in that case approve the doctrines of *Loomis* v. *Jackson*, 6 W. Va., 613, holding that any provisions in regard to the matter of holding and conducting elections and counting votes and certifying results must be held to be only directory, and that, when the true result has been ascertained, or can be ascertained, no irregularity, mistake, or even fraud by the officer of the election, or by any other person, can be per-

mitted to defeat the popular will as expressed in said election. Now, how can it be said that the mere manner of the signatures of the poll clerks is any fraud upon the election, or can at all render the election uncertain? It is wholly an immaterial irregularity. In the case of *Dial* v. *Hollandsworth, supra,* the Court went so far, in order to uphold a fair result, that it ignored the act of officers of the election in appointing two poll clerks without a shadow of authority, and the acting of such unlawful poll clerks of the same political party in preparing the ballots of illiterate voters in separate rooms, with every opportunity to falsify the ballots. I thought that they produced such uncertainty as to the result, or left the door so wide open for fraud, that it was a material variance from what the law required. But the court condoned that,—a vastly more serious irregularity than the one involved in this case. And now, applying the principles of the *Dial Case* to this case, it is plain to me that we ought not to overthrow the election in this case for that cause. It would be a violation of the principles laid down in the *Dial Case.* I see no trouble in the fact that Code, c. 13, s. 17, cl. 3, says that, "when the signature of any person is required it must be in his own proper handwriting or his mark attested, proven or or acknowledged." Here the signature is clearly proven. You allow one to make a cross mark, and, if it be proven, the statute makes it good. When the whole signature is proven genuine, is not that good? Take the case of a blind or sick or illiterate person authorizing you to write his whole name. Is not that good under the statute when, if he made his mark, it would unquestionably be? The ballots were not sealed up, but they were put into the ballot box by the officers of the election, and there locked, and identified by all the officers of the election as the true and genuine ballots of that precinct, and there is nothing to show to the contrary; and the *Dial Case,* and, indeed, the law generally, would overlook that irregularity. Those genuine ballots are here to tell their tale, and they tell it with certainty, so that we cannot say that this irregularity produces any uncertainty. This decides the case for Thompson.

There are some votes counted for Thompson which

it is claimed should not have been counted for him, and some which it is claimed should have been counted for Snodgrass, which, however, were not counted for him. I have looked carefully over the original ballots, and, if there were any improperly counted for Thompson or Snodgrass, they are nearly equal in number, and cannot at all affect the result. Therefore I would do what the circuit court should have done, and did virtually do, affirm the decision of the county court declaring Thompson lawfully elected.

McWHORTER, JUDGE, concurs.

ENGLISH, PRESIDENT:

On the 5th day of December, 1896, R. E. L. Snodgrass presented his petition, verified by his affidavit and accompanied by copies of four bills of exceptions, praying a writ of *certiorari* be awarded him directed to H. K. Cosgray, James Jolliff, and David Dulany, commissioners of the county court of Wetzel county, and *ex officio* a board of canvassers of election returns of said county, commanding them, as such board of canvassers, to bring into the circuit court of said county the proceedings in the matter of canvassing and recounting the votes of an election held for clerk of the county court of said county on the 3d day of November, 1896, in which election said Snodgrass, was a candidate for said office, and Henry R. Thompson was the opposing candidate for said office, which writ was awarded in pursuance of said petition, and made returnable on the 21st day of December, 1896.

The principal fact relied on by the petitioner, R. E. L. Snodgrass, in his application for the *certiorari* in this case, is that D. M. Poe and A. A. Merrifield, who acted as poll clerks in said election at precinct No. 1, in Grant district, of said county, divided the ballots provided by the ballot commissioners for that election precinct between them, and each of said clerks took said ballots to his desk, and on the back of said ballots would write under the printed words "Poll Clerks" his own name, and also the name of the other poll clerk, and that said ballots upon which both poll clerks' names were so written were delivered by them to the voters as they came into the election room, and so voted

by the voters of said precinct; that said arrangement for each poll clerk to write his own and the other poll clerk's name upon the back of said ballots was by agreement between said two poll clerks, and was known and consented to by the commissioners of election at that place ; that each of said poll clerks was absent at times from the election room during the time that the polls were open, leaving the other clerk present ; that neither of said commissioners nor poll clerks could say without an examination of each ballot that there were any ballots voted at said precinct upon the back of which each poll clerk wrote his own name ; and that on the 10th day of November, 1896, while said board was proceeding to open the sealed packages of ballots laid before them by the clerk of the county court of said county returned from the several voting precincts thereof, and to count the number of ballots in each package so returned, the said clerk of the county court laid before said board a bunch of unsealed ballots purporting to be the ballots voted at said election at precinct No. 1 of Grant district of said county, and that the number of said ballots contained in said unsealed package, when counted by said board of canvassers, was ascertained to be two hundred and seventy-six. And the said board of canvassers, after counting the number of said ballots in each sealed and unsealed package laid before them from the several voting precincts in said county, proceeded to canvass the return of said election, and to ascertain the result thereof from the face of the certificate returned from the several voting precincts in said county, and, the said board having reached the returns of said precinct No. 1 of Grant district, said Snodgrass objected to the board canvassing the returns from said voting precinct, and moved the court to reject the ballots and returns from said voting precinct, and not to include them in their ascertainment of the result of said election as to said office of clerk of the county court of Wetzel county, but to ascertain and declare the result of said election as to said office of clerk of the county court without including therein the said returns from said precinct No. 1 of Grant district, for the reason that on the back of each of the ballots voted at said voting precinct each poll clerk did not write his name under the words

"Poll Clerk," and for other irregularities and defects as
shown by the returns, and the condition of said unsealed
ballots ; which motion was overruled, and the board of can-
vassers opened the returns from said precinct No. 1 of
Grant district, and found from the face of the returns that
there were two hundred and seventy-six votes in all cast at
the precinct, and that said Snodgrass received at said pre-
cinct one hundred and one votes, and that said Henry R.
Thompson, for said clerk of the county court, received at
said precinct for said office one hundred and forty-two
votes, a majority in favor of said Henry R. Thompson of
forty-one votes ; and on completing the canvass it was
found by said canvassers that said Snodgrass received in
all the precincts, including precinct No. 1 of Grant dis-
trict, one thousand nine hundred and ninety-four votes,
and Henry R. Thompson two thousand and twenty votes
for said office, a majority in favor of said Thompson of
twenty-six votes.   Said Snodgrass further claimed in his
petition that during the recount said board of canvassers
threw out and rejected thirty-five votes or ballots which
should have been counted for him for the office of clerk of
the county court, and counted for said Thompson thirty-
one other votes or ballots which should have been thrown
out and rejected and not counted for said Thompson, which
thirty-five votes so rejected for said petitioner he requested
and demanded said board of canvassers to count for him,
but they refused his request, and rejected said thirty-five
votes or ballots; and said thirty-one other votes which said
board counted for said Thompson the petitioner moved to
reject, but the board overruled the motion, and counted
the thirty-one votes for Thompson for said office, to which
action and ruling of said board in rejecting said thirty-five
votes, and not counting them for petitioner, and to the
action of said board in counting the thirty-one other votes
for said Thompson, and in overruling petitioner's motion
to reject them, said petitioner excepted, and the board of
canvassers signed for petitioner a bill of exceptions setting
forth its rulings as to the rejection of said thirty-five votes,
and as to its counting said thirty-one other votes, which
are attached to and made part of said bill of exceptions and
marked with letters for identification.   Said Thompson

also presented to said circuit court a petition for a writ of *certiorari*, setting forth therein his reasons for asking the same to the action of the board of canvassers in counting the votes at said election, which writ of *certiorari* was also awarded, and on the 26th day of December, 1896, the court proceeded to hear the causes together, regarding the petition in the second *certiorari* above mentioned as a cross assignment of errors, and held that the county court of Wetzel county, sitting as a board of canvassers of said election returns, committed no error to the prejudice of the petitioner in refusing to reject the two hundred and seventy-six votes cast at (Big Run) precinct No. 1, in Grant district, in Wetzel county, and that in that particular their action was affirmed; to which ruling the petitioner excepted. The court further held that as to the action of said board in counting certain votes in the petition in the second cause mentioned, which ballots, with the objections thereto, are also mentioned and described in the petition in said first cause as well as in the records of the proceedings in both cases, the board of commissioners committed errors to the prejudice of both Henry R. Thompson and R. E. L. Snodgrass in the following particulars: (1) In refusing to count certain ballots for Thompson which they should have counted for him, and in counting certain ballots for said Snodgrass which they should not have counted for him. (2) In refusing to count certain ballots for said Snodgrass which they should have counted for him, and in counting certain ballots for said Thompson which they should not have counted for him.

The court, having before it as part of the record in these causes said original ballots, proceeded to inspect the same, to determine whether or not the same were properly disposed of by said board of canvassers, and designated by certain letters such ballots as should have been counted for Henry R. Thompson, and in the same manner designated what ballots should have been counted for R. E. L. Snodgrass, and also what ballots should have been entirely rejected, and directed the county court to correct their canvass in the manner thus indicated, and then to declare the result as to said office of clerk of the county court of Wetzel county. From this order this writ of error was applied for and obtained.

The first error assigned and relied upon by the plaintiff in error is that it was error in the circuit court in not sustaining the motion first made before said board of canvassers to reject the ballots and returns from voting precinct No. 1 of Grant district, which motion is set forth in bill of exceptions No. 1, and was predicated upon the fact that the ballots from said precinct were returned to the clerk of the county court without being sealed up as required by statute, and were strung upon a string and placed in a ballot box, and were locked therein; and upon the further fact that, before the voting commenced at said precinct, part of the ballots for that precinct were taken by each of the poll clerks, and under the words "Poll Clerks" indorsed on the back of said ballots, each clerk would write his own name and the name of the other poll clerk, and thus indorsed they were delivered to the voters as they came into the election room.  Our Code, p. 70, c. 3, s. 36, provides that "on the back of each sheet of paper on which the ballots are printed as aforesaid, and as near the center thereof as may be, shall be printed the words 'Poll Clerks,' and under them each poll clerk shall write his name before the ballot is delivered to the voter, and the sheet containing said ballots shall be so folded as to show the words 'Poll Clerks,' and the signatures of said clerks written thereon, before depositing the same in the ballot box."  It is further provided in section 66 of the chapter that any ballot not indorsed with the name of the poll clerk, as provided in this chapter, shall be void, and shall not be counted. This language is imperative.  The legislature had some object in view, surely, when it enacted this section, and the manifest object was to prevent fraud and imposition upon the commissioners of election who received the votes. By section 8 of the same chapter the poll clerks are to be appointed "from each of the political parties which cast the largest number of votes at the last preceding general election in the state, and they must be qualified voters in their district."  The fact that these poll clerks are required to be appointed from different political parties clearly indicates that it was not the intention that one of them should perform the duties for the other, when the statute expressly requires that such duties should be performed individually.

When the returns of this election were brought before the board of commissioners, a bunch of unsealed ballots, which purported to have been cast at precinct No. 1 of Grant district, was found among the number, and bill of exceptions No. 1 states that they were in the following condition: "They were not sealed up in any envelope or other wrapper, but were strung upon a thread, and laid in that condition in a ballot box, together with one set of sealed poll books, tally sheet, and certificates. Said ballot box, when so laid before said board, was locked with two different keys, but not sealed. The clerk of the county court, Henry R. Thompson, had said keys in his possession, and unlocked said box in the presence of said board, and exhibited to it the contents of said box, and stated that the contents were the election returns made to him by one of the commissioners of election at said voting precinct No. 1 of Grant district." Now, while it does not appear that this Henry R. Thompson, who was acting as clerk of the county court at the time these returns were made, was the same Henry R. Thompson who is a party to this contest or not, yet the law did not intend that any county clerk should have access to the ballots which were required to be returned in a sealed package, properly indorsed, until such package was opened in the presence of the board of canvassers. It is apparent that this provision was intended to prevent the ballots from being in any manner tampered with before they were examined and counted by the board of canvassers.

Said bill of exceptions further shows that on the 3d day of November, 1896, D. M. Poe and A. A. Merrifield acted as poll clerks, as before stated, at said precinct, and that each of said poll clerks, while the election was in progress, took a bunch of the election ballots to his desk; that on the back of said ballots D. M. Poe, under the words "Poll Clerks," would write his own name, and would also write the name of the other poll clerk, A. A. Merrifield; that said ballots so indorsed by D. M. Poe, clerk, were delivered by him to the voters as they came into the election room; that the said A. A. Merrifield did the same with ballots taken to his desk by him; and neither of said poll clerks, when examined, could say, without referring to

each ballot, there was any ballot voted at said precinct up-
on the back of which, under the words "Poll Clerks," each
clerk wrote his own name, yet the circuit court held that
the county court of Wetzel county, sitting as a board of
canvassers of said election returns, committed no error to
the prejudice of R. E. L. Snodgrass in refusing to reject
the two hundred and seventy-six votes cast at Big Run
precinct No. 1, in Grant district, Wetzel county, and
affirmed their action in that particular, although the face
of the returns from said precinct gave forty-one majority
against Snodgrass and in favor of Thompson.  The circuit
court, having the original ballots before it, which were ex-
cepted to by the respective parties to this contest as im-
properly counted or rejected, proceeded to designate, by
letters in red ink, which ballots should have been counted
by said canvassers for Henry R. Thompson, which ballots
he marked "X J"; those that should have been counted for
R. E. L. Snodgrass were marked by him in red ink as fol-
lows "— J"; and those to be entirely rejected were also
marked in red ink "R. J."

After an examination of these original ballots, which
were brought before us on *certiorari*, I find thirteen ballots
which the circuit court improperly directed to be counted
for said Thompson, and six ballots which were cast for
Snodgrass, which were improperly directed, as I think, by
the circuit court, to be rejected by the board of canvas-
sers.  McCrary, in his valuable work on Elections (3d Ed.
p. 318, § 476), states the law thus :   "While a mere irregu-
larity which does not affect the result will not vitiate the
return, yet where the provisions of the election law have
been entirely disregarded by the officers, and their con-
duct has been such as to render their returns utterly un-
worthy of credit, the return must be rejected.   In such a
case the returns prove nothing, but it does not follow that
legal votes cast at such poll must be lost.   They may be
proven by secondary evidence (the return being, until im-
peached, the primary evidence), and when thus proven
may be counted."   This law shows the importance of hav-
ing these returns made as the law requires.   Until im-
peached, they are primary evidence ; but when returns are
made as they were in the case under consideration, utterly

disregarding the plain provisions of the statute, both as to the manner of indorsing and issuing the ballots, and as to the manner of sealing and returning them to the clerk of the county court, in such manner as to prevent them being tampered with by interested parties, surely such returns prove nothing, and should be rejected. Section 61 of chapter 3 of the Code provides that "no commissioner of election shall deposit in the ballot box any ballot upon which the names of the poll clerks as hereinbefore provided for do not appear," that is, the name of each clerk, written by himself, as provided in section 36 of the same chapter; and, as we have seen, section 66 of the same chapter provides that "any ballot which is not indorsed with the names of the poll clerks as provided in this chapter shall be void and shall not be counted." Thus the law is written, and we must accept it as we find it. It is not for us to discuss the necessity or expediency or reasonableness of the law, but we are to enforce the law as it exists. McCrary, Elect. (3d Ed.) § 190, states the law as follows: "If the statute expressly declares any particular act to be essential to validity of the election, or that its omission shall render the election void, all courts whose duty it is to enforce such statute must so hold, whether the particular act in question goes to the merits or affects the result of the election or not. Such statute is imperative, and all considerations touching its policy or impolicy must be addressed to the legislature." So, in the case of *West* v. *Ross*, 53 Mo., 350, it was held that "the provision of the statute concerning elections that all ballots cast shall be numbered, and that ballots not numbered shall not be counted, is not merely directory, but mandatory, and an officer elected by votes not numbered, as required by that statute, will, on contest raising that issue, be held to have forfeited his election." See, also, *Ledbetter* v. *Hall*, 62 Mo., 422, where the same is held. So, also, in the case of *Boyd* v. *Mills*, 53 Kan. 607, (37 Pac. 16,) Allen, J., in delivering the opinion of the court, says: "We have examined the numerous cases cited by counsel, and from them deduced two rules, which seem to be steadily adhered to by the courts: (1) That under laws similar to our own, designed to preserve the secrecy of the ballot any mark or distinguishing feature apparent on the bal-

lot, renders it void; (2) where the law is explicit in prohibiting the counting of any ballot which does not conform to the requirements of the statute, that the courts will enforce the law as it reads, without interposing their own judgment as to the reasonableness or unreasonableness of the requirements." Again, section 22 of the act of June 22, 1891, of Illinois, provides that "one of the judges shall give the voter one and only one ballot, on the back of which such judge shall indorse his initials.   *   *   *   No ballot without the official indorsement shall be allowed to be deposited in the ballot box and none but ballots provided in accordance with the provisions of this act shall be counted." These provisions are mandatory.  See *Parker* v. *Orr*, (Ill.) 41 N. E. 1002; also *Catron* v. *Craw*, (Ill.) 46 N. E. 3.   It is true that this Court in the case of *Dial* v. *Hollandsworth*, 39 W. Va., 1, (19 S. E. 557,) held (point 2 of syllabus) that "the return of a poll by the commissioner of election is *prima facie* the true result of the election, and will not be reversed by this Court because of misconduct on the part of the election officers or other persons, unless it plainly appears that such misconduct changed the result of the election." This ruling, as I understand it, does not apply to acts of officers which the statute, in so many words, declares renders the votes cast void, and thus plainly changes the result of the election, but does apply to provisions of the statute which are merely directory, and do not affect the result.  As we have seen, our statute provides that "any ballot which is not indorsed with the names of the poll clerks, as provided in this chapter, shall be void and shall not be counted." The proof before the board of commissioners clearly showed that none of the ballots voted at precinct No. 1 were indorsed as the statute requires, and the result follows that they are void, and could not be counted, which would certainly change the result.  My conclusion, therefore, is, for the reasons above stated and in the light of the authorities cited, that the circuit court erred in refusing to reject the ballots and returns from voting precinct No. 1 of Grant district, and also in directing the board of canvassers to count thirteen of the ballots marked by him "X J" for Thompson, and improperly directing said board to reject six of the votes

cast for Snodgrass. JUDGE DENT concurs with me in the foregoing opinion, but JUDGES McWHORTER and BRANNON dissent therefrom. The judgment of the circuit court is therefore affirmed.

<div align="center">

ON REHEARING.

(March 23, 1898.)

</div>

BRANNON, PRESIDENT:

A petition for rehearing makes the burden of its argument the fact that the statute requiring poll clerks to sign their names is mandatory, and therefore concludes that they must sign with their own hands. This is *non sequitur.* I admit that the provision is mandatory. Therefore, if there were no signatures at all, or only one, the ballots would be void; but the signatures are both found on the ballots, though the act of signing was irregularly done. So the question is not whether the statute is mandatory, but whether, though mandatory, the signing is a substantial compliance with it; for, though a statute be mandatory, literal compliance with it is not indispensable, but a fairly substantial compliance is sufficient. Suth. St. § 454. The statute against oral contracts is also mandatory, because it prohibits actions on certain contracts unless signed, and it is settled that signature by one man in the presence of another, with his assent, complies with the law, as shown above. Appealing to the principles of the *Dial Case* that substantial compliance with a statute is all that is necessary, and that an innocent misstep not shown to produce a wrong in an election, will not affect it, I hold that this irregularity ought not to defeat the result of a fair election. Nor is the question here one of agency. It is not whether a poll clerk can constitute an agent to sign in his absence, as he was present directing the act.

<div align="right">

*Affirmed.*