# CHARLESTON

## Williamson *v.* Musick.

Submitted January 17, 1906.    Decided February 13, 1906.

1. Appeal—*Decisions Renewable—Election Contests.*
    This Court has jurisdiction, upon writ of error, to review the final order of a circuit court in an election contest for a county office, where it is shown that the value of the office is greater than one hundred dollars. (p. 61.)

2. Elections—*Election Contest—Constitutional Law—Appeal.*
    The part of chapter 80 of the acts of the legislature of 1901 which provides for an appeal, by either party, from the final order or decision of the county court in an election contest for a county or district office, to the circuit court and a trial *de novo* in that court, is constitutional. (p. 61.)

3. Same—*Returns—Rejection.*
    Before the certificate return of the result of an election, made by the commissioners, can be rejected on the ground of fraud in the conduct of the election, it must appear that the proceedings in the conduct thereof were so tainted with fraud as to change the result, or that the truth cannot be deduced from the return. (p. 65.)

·4. SAME—*Irregularities.*

Irregularities in the conduct of an election are generally to be disregarded, unless the statute declares that they shall be fatal to the election, or unless they are such in themselves as to change, or to render it impossible to ascertain. the result. (p, 66.)

·5. SAME.

As a general rule, when the true result of a legal election has been ascertained, or can be ascertained, by the officers charged with the performance of the duty, no irregularity, mistake, or even fraud, committed by any of the officers conducting the election, or by any other person, will render the election void. (p. 66.)

·6. SAME—*Certificate—Return—Conclusiveness.*

Where, upon the trial of an election contest for a county office, it appears that the ballots cast at an election precinct have been tampered with, after the return by the commissioners of election, and that part of the ballots are void because one poll clerk, had signed thereon the names of both poll clerk, and that the remainder of the ballots are not void for want of proper signing by both poll clerks, and that the certificate return of the result of the election made by the commissioners thereof is not otherwise impeached, the ballots will not prevail over the certificate return as evidence of the result of the election at that precinct. (p. 69.)

Error to Circuit Court, Mingo County.

Proceeding by H. H. Williamson against E. E. Musick to ·contest the election of sheriff. Judgment for contestee, and Williamson brings error.

*Reversed.*

SHEPPARD & ·GOODYKOONTZ, HARRY SCHERR, MOLLOHAN, McCLINTIC· & MATHEWS, CHARLES E. HOGG, S. U. G. RHODES and WILLIAMS, SCOTT & LOVETT, for plaintiff in error.

H. K. SHUMATE, STOKES & BRONSON, HOLT & DUNCAN and J. L. STAFFORD, for defendant in error.

COX, JUDGE:

H. H. Williamson and E. E. Musick were opposing candidates for the office of sheriff of Mingo county, at the general election held on the 8th day of November, 1904, for the term beginning January 1, 1905. After the election, the returns were canvassed, resulting in favor of Williamson. A re-·count was demanded by Musick, resulting in his favor, and ·a certificate of election was issued to him. Notice of contest was given by Williamson, and a counter notice by Musick.

A trial of the contest was had before the county court, resulting in favor of Musick. An appeal was taken by Williamson to the circuit court of Mingo county, resulting upon trial in his favor. Musick brings the case here for review by writ of error.

Williamson moves to dismiss the writ of error, on the ground that this Court has no jurisdiction. It is contended that election contests for county offices are purely statutory, and that no provision has been made by the statute for review by this Court. There is much authority outside of the state sustaining this contention. 15 Cyc. 435, Notes 99 and 2. While this is true, we do not consider that it is an open question in this state. In the case of *Dryden* v. *Swinburn*. 15 W. Va. 234, JUDGE GREEN delivered the opinion of the Court. The ninth point of the syllabus holds: "The record showing that the office of the clerk of the circuit court of Kanawha county is of greater value than one hundred dollars, the Supreme Court of Appeals has appellate jurisdiction by writ of error to review the decision of the circuit court in such a case." Also, in the case of *Dryden* v. *Swinburn*, 20 W. Va. 89, JUDGE GREEN again delivered the opinion. The fourth point of the syllabus holds: "In a contest about an office before the county court or other inferior tribunal, the decision of said tribunal may be reviewed by the circuit court by writ of *certirorari*; and the decision of the circuit court may be reviewed by the Supreme Court of Appeals, by writ of error." Following those cases, this Court, in numerous contested election cases, has taken jurisdiction by writ of error. See *Halstead* v. *Rader*, 27 W. Va. 806: *Ralston* v. *Meyer*, 34 W. Va. 737; *Alderson* v. *Comrs.*, 32 W. Va. 454; *Elbon* v. *Hambrick*, 55 W. Va. 236; *Snodgrass* v. *Wetzel Co. Ct.*, 44 W. Va. 56; *Davis* v. *Brown*, 46 W. Va. 716; *Fowler* v. *Thompson*, 22 W. Va. 106; *Dial* v. *Hollandsworth*, 39 W. Va. 1; and *Doll* v. *Bender*, 55 W. Va. 404. Under the former practice, review by the circuit court was by writ of *certiorari* to the decision of the county court in such case: but this has been changed by statute. This makes no difference as to the question of jurisdiction by this Court. It will be observed that the constitutional provision, section 24, Article VIII., uses the word "cases" in relation to election contests for county and district offices. We, therefore, con-

sider it settled that this Court has jurisdiction, by writ of error, to review the final order of a circuit court in an election contest for a county or district office, where it appears that the value of the office is greater than one hundred dollars. It does so appear in this case.

The contestee raises the question of the constitutionality of that part of chapter 80 of the acts of the legislature of 1901 which provides for an appeal by either party, in such case, to the circuit court, and for a trial *de novo* in that court. It is contended by contestee that the clause of section 24, Article VIII., of our Constitution, in relation to county courts, which provides that "they shall, in all cases of contest, judge of the election, qualifications and returns of their own members, and of all county and district officers, subject to such regulations, by appeal or otherwise, as may be prescribed by law," prevents the passage of a statute providing for a trial *de novo* by the circuit court in such case of election contest. The part of said clause reading "subject to such regulations, by appeal or otherwise, as may be prescribed by law," was added by the amendment which went into effect on the first day of January, 1881. It is contended that the added words mean nothing more than that a review for error may be provided for by statute, and that the county court is still the judge of an election contest for a county or district office. The statute under consideration does not take away the jurisdiction of the county court in the first instance to hear such contest. It simply provides for regulation by appeal to the circuit court, and a trial *de novo*. The word "appeal," when used in practice, is defined by Mr. Bouvier as follows: "The removal of a cause from a court of inferior to one of superior jurisdiction, for the purpose of obtaining a review and retrial." See, also, Elliott on Appell. Juris., section 15; Powell on Appell. Juris., section 10. The words of the constitutional provision are very broad, permitting such regulation, by appeal or otherwise, as may be prescribed by law. We are clearly of the opinion that the constitutional provision does not deny the legislature the power to pass a statute authorizing an appeal and a trial *de novo* in the circuit court, in such case of election contest.

We come now to the merits of this controversy. The parties and their attorneys have aided the court materially in

narrowing the scope of the controversy. The real controversy now presented relates to but one election precinct, being precinct No. 3 in Magnolia District of Mingo county, known and referred to in the proceedings as "Matewan Precinct."

The first ground of contest contained in the notice of the contestant is, in substance, that the election at Matewan Precinct is null and void, by reason of fraud, trickery, corruption and irregularity in the conduct thereof. Under this ground, the notice sets out numerous specifications, designnated by the letters of the alphabet from "(a)" to "(y)" inclusive. This ground of contest does not specify individual votes which the contestant claims to have been cast by persons not entitled to vote, and does not specify votes rejected which should have been received. This ground goes to the validity of the poll at that precinct, and not to the legality of individual votes. The circuit court sustained this ground of contest, and held the election at Matewan Precinct void.

The contestant offered evidence tending to prove the following under this ground, in relation to Matewan Precinct: That the place of holding the election established by law was the H. S. White store house; that the election of 1900 was held in the H. S. White store room, part of said house; that the election of 1904 was held in the same house; that the house had been so changed that the entrance to the election room was from a different street; that the election was held in two office rooms, on the first floor, in 1904, the commissioners remaining in one room and the booths being placed in the other, with the door between the rooms open while the voting took place; that R. W. Buskirk and T. G. Burgess acted as poll clerks; that, before the election commenced, J. H. Green was named by a voter or voters of his political party for poll clerk, and was voted for by persons present; that R. W. Buskirk was also named, and voted for by persons present; that, after such voting, Buskirk "jabbed his pistol down in his pocket and said, 'By God, if I don't be poll clerk, nobody else would be,'" (only one witness saw the pistol); that both Green and Buskirk entered the election room; that, of the two election commissioners of the same party to which Green and Buskirk belonged, one voted for Green and the other for Buskirk; that the commissioner of

the other political party decided the contest by administering the oath to Buskirk; that in some instances, the poll clerks offered to assist voters in making out their ballots; that Burgess on one occasion marked a ballot improperly, which by direction of the voter was corrected; that in some instances the poll clerks acted separately and not in the presence of each other, in assisting voters to make out their ballots; that on one occasion one of the poll clerks had a ballot in his hand, while the voter had another; that in a few instances the poll clerks electioneered voters; that no vote was changed by the electioneering; that, while a challenger was allowed to challenge persons offering to vote, time was not given to ask such persons all the questions which the challenger or one of the commissioners desired to ask; that in some instances challenged persons were allowed to vote without making the statutory affidavit; that at one time one of the challengers saw a pistol on a shelf at an election booth, and two guns standing in a corner of the booth room (no other witness is produced who saw them); that a challenger went into the booth room with a commissioner, where they took a drink of whiskey; that at one time during the election a candidate for a district office and another person were seen in the booth room not voting; that one of the commissioners served a short time after the polls opened, and then went home; that the remaining commissioners chose another of the same political party as the one who went home; that the person so chosen, being sworn, acted during the remainder of the election; that the commissioner who went home, assigning a reason therefor, said: "I could not have anything transacted according to law, and I didn't think without trouble or something they wouldn't hear to anything that was law;" that, previous to the election, one of the commissioners made a wager on the result of the election (the persons who testify to this do not know whether the wager was recalled before election day or not, and it is conclusively shown by contestee's evidence that the wager was recalled by the commissioner before election day, and that the money placed by him in the hands of the stake holder was returned before election day); that the ballot box furnished to the commissioners of election had a hole in the top of it, other than the place for the insertion of the ballots; that some of the ballots were placed in the

box through this hole, because of difficulty in inserting them through the place intended therefor; that one of the commissioners, after Buskirk was sworn, ordered Green to go out of the election room, and threatened to arrest him if he did not do so; that the commissioner who served a short time in the morning came back in the afternoon to vote, and was told by a poll clerk that he had no right to vote, or words to that effect; that this remark was made in a jocular way; that he was told by one of the commissioners that the remark was a joke, and was asked to vote, but did not do so; that the ballots counted by the commissioners on the morning of the election, did not agree in number with the statement of the clerk by whom they had been sent. The foregoing, other than the fact that some of the ballots voted had been signed by one poll clerk for both, which will be noticed in another connection, are all the matters which we consider material under the first ground of contest. The evidence of contestant as to many of these matters is rebutted by contestee's evidence, or explained by it; but we have mentioned those matters which the contestant's evidence alone tends to prove.

The object of an election, in a popular form of government, is to obtain a free, fair and untrammeled expression of the will of the people with whom the elective franchise has been placed. Every qualified voter has the right to freely cast one ballot, and to have that ballot express his choice, and to have it counted as cast. Without the freedom and purity of the ballot, the experiment of self-government fails. When it becomes apparent that an election is a subversion, rather than expression, of the will of the people, or that the result is attended with such uncertainty that it may not be ascertained, the election should be set aside. Elections being necessary to the existence of a popular form of government, the policy of the law is to uphold them when it can be done consistently with legal principles.

"In election cases, however, before a return can be set aside, there must be proof that the proceedings in the conduct of the election, or in the return of the vote, were so tainted with fraud that the truth cannot be deduced from the returns." McCrary on Elec., section 569.

"If we keep in view these general principles, and bear in mind that irregularities are generally to be disregarded, un-

less the statute expressly declares that they shall be fatal to the election, or unless they are such in themselves as to change or render doubtful the result, we shall find no great difficulty in determining each case as it arises under the statutes of the several States." McCrary on Elections, section 227.

In *Dial* v. *Hollandsworth*, 39 W. Va. 1, JUDGE DENT, delivering the opinion of the Court, quotes approvingly the following language: "Many provisions of the law in regard to the manner of holding and conducting the election and counting the votes and certifying the result, must be held to be directory only, and intended to point out to inexperienced and ignorant persons, who sometimes act as election officers, a plain, easy and direct way by which [they are to attain the great end of their creation, viz., to ascertain the true result of the election. When the true result of the legal election has been ascertained, or can be ascertained, by the officers charged with the performance of the duty, no irregularity, mistake, or even fraud, committed by any of the officers conducting the elecion, or by any other person, can be permitted to defeat the fair expression of the popular will as expressed in said election.

"What irregulatities are held to be material? It is affirmed that no irregularity, or even misconduct, on the part of the election officers or other persons, will vitiate an otherwise legal election, unless the result thereof has been thereby changed, or rendered so uncertain as to make it impossible to ascertain the true result. A different rule would make the manner of performing a public duty more important than the duty itself." JUDGE DENT adds: "There is no good reason why these principles should not apply to the present election law, as well as to any other. The contestant neither alleges nor proves that the result of the election was changed, or rendered so uncertain as to make it impossible to ascertain the true result; and yet he wants the Court to set aside the election, and declare him the choice of the people, for the sole reason that the commissioners, acting out of a too abundant fear that all the voters would not have an opportunity to vote, and so the right of suffrage be denied them, appointed two additional ballot clerks to assist in holding the election, and thus unlawfully placed these persons in a posi-

tion to defeat a fair expression of the popular will, if dishonest enough to do so and willing to risk the chances of confinement in the penitentiary." The third point of the syllabus in that case is as follows: "The return of a poll by the commissioners of election is *prima facie* the true result of the election, and will not be reversed by this Court because of misconduct on the part of election officers or other persons, unless it plainly appears that such misconduct changed the result of the election." See, also, McCrary on Elec., section 222; 10 Am. & Eng. Enc. Law, 766; 15 Cyc. 372.

Applying these principles to this case, the members of this Court are unanimously of the opinion that the irregularities which the contestant's evidence tends to . prove, are insufficient to render void the election at Matewan Precinct.

We deem it unnecessary to take up each irregularity mentioned. A few claimed to be the most serious, will suffice for illustration. The election room was in the same building which was established by law as the place of voting. It was changed since the election of 1900, so that the entrance was from another street; but it is not shown that any voter was misled, or that the result was changed thereby. The mere fact that the election was held in two rooms, instead of one, will not of itself, without showing change of result, invalidate the poll.

The kind of ballot box is prescribed by statute; but the statute also provides that, if no ballot box be found, the commissioners may make one. Code, chapter 3, section 42. It cannot be conceived that the mere fact that there was a hole in the ballot box, when it is not shown that such defect affected the result of the election, would be sufficient to invalidate it.

It is claimed that poll clerk Buskirk was a usurper. Be that as it may; we deem it immaterial. In *Dial* v. *Hollandsworth*, it was shown that there were four poll clerks, two of whom were usurpers. The usurpers acted separately in assisting voters to make out their ballots; and yet, this Court upheld the election.

The few instances of electioneering by the poll clerks shown in this case, by which no vote was changed, we think also

insufficient to invalidate the election. To hold otherwise would be to place a great power in the hands of· a poll clerk, who might, intentionally or otherwise, violate the law by suggesting to a voter the manner in which the clerk would like him to vote.

The admission of the votes of persons challenged, without the statutory affidavits, we think likewise insufficient to invalidate the election. The statute provides that a person challenged shall not vote, unless he makes the statutory affidavit, but, if he does vote without the affidavit, his vote may be thrown out if illegal. The result could not be more than an illegal vote; and illegal votes are insufficient to invalidate an election where they can be thrown out, or where it is not shown that they are sufficient in number to change the result. *State* v. *O'Day*, 69 Ia. 368; *Esker* v. *McCoy*, 5 Ohio 573; *Rader* v. *Board of Education*, 57 W. Va. 220; *Brazie* v. *Comrs.*, 25 W. Va. 213.

We might review each irregularity claimed, reaching the result that it is insufficient to invalidate the election. We are, therefore, of opinion that the circuit court erred in holding that the election at Matewan Precinct was void by reason of the matters shown under the first ground of contest.

What we have said does not conclude this case, as the second ground of contest by the contestant is in effect that three hundred and thirty-seven of the votes cast and counted for contestee at Matewan Precinct were void, under the decision in the case of *Kirkpatrick* v. *Deegans*, 53 W. Va. 275, by reason of the fact that they had been signed by one of the poll clerks for both. It is shown that all but four of the ballots cast at Matewan Precinct were so signed.

Controversies in relation to the election of county officers of Mingo county, at the election of 1904, have previously been before this Court for decision. The cases involving such controversies are *Stafford* v. *Board of Canvassers*, 56 W. Va. 670, and *Stafford* v. *Board of Canvassers*, 50 S. E. Rep. 1016. It appears from the evidence that, during the recount for county officers by the board of canvassers, the ballot box and the ballots cast at Matewan Precinct, as well as other ballot boxes, were placed in the custody of the sheriff, by order of the board, in whose custody they remained for a

number of days.   When the board came to recount Matewan
Precinct, and the ballot box and ballots were produced, it was
found that they bore the evidence of having been tampered
with, and that the two paper sacks containing the ballots,
which had been placed therein by the members of the board
previously, and who had written their names across the
places where they were sealed, had been torn open.   The
canvassing board refused to count these ballots on the re-
count, and Stafford applied to this Court for a writ of *man-
damus*.   It was decided in the last case mentioned that there was
a *prima facie* case of tampering with the ballots.   We quote
from the opinion as follows:   "It is undenied and undeniable
that the sacks of ballots at Matewan Precinct bore unmis-
takable appearance of having been tampered with.   The tops
of the sacks were partly torn open, and the names of the
members of the board of canvassers, which they had written
across the sealing places of the sacks, were gone.   Under
principles stated in *Dent* v. *Board*, 45 W. Va. 750, the ap-
pearance and condition of the sacks of ballots raised the pre-
sumption of unlawful tampering, and excluded the ballots
from recount, and called for the declaration of the result of
the election at that precinct upon the certificate returned by
the precinct officers.   *   *   *   There stands the *prima facie*
case of tampering presented by the very appearance of the
broken sacks.   The canvassers knew that they had been so
tampered with, as they themselves had but recently sealed
them in the sacks when they canvassed the returns of that
precinct.   When you propose to introduce oral evidence to
repel a *prima facie* case of tampering, what is the character
of such evidence; where will it lead?   It opens a broad field,
and presents a case judicial in character, proper for a court
of contest."   It is clear, under the opinion in that case, that
the board of canvassers was in effect directed, in case the
evidence of tampering was not rebutted by comparing the
ballots with the certificate return of the commissioners of
election, and if it found part of the ballots void because
signed by one of the poll clerks for both, and part valid, be-
ing properly signed by the poll clerks, that the precinct
should not be rejected, but that the certificate return should
be taken.   This being true, the question here presented as to
this branch of the case is, has the *prima facie* case of tam-

pering been rebutted or overcome by the evidence? The members of this Court are unanimously of the opinion that the *prima facie* case of tampering has not been rebutted. The evidence of tampering has been strengthened upon the trial in the contest court. It is true that evidence has been offered tending to show the identity of the ballots—that is, the identity of the pieces of paper; but this evidence does not prove that the faces of the ballots are the same, or that they are genuine as evidence of persons voted for. It is also shown that the two packages of ballots, when they were placed by the board of canvassers in the paper sacks, were tied with strings, and that when produced they appeared to be in the same condition. But no identifying marks were on the strings, and there was no peculiarity about them, or the manner of tying them, which enabled the witnesses to say that they had not been untied. Evidence was also offered tending to show that the packages of ballots could not be brought through the hole in the ballot box without untying. No witness was able to say that they were not untied; and there is the fact that the ballots did not correspond with the certificate return, varying as much as twenty-three votes as to one candidate. The evidence of the sheriff, in whose custody the ballot box and ballots were placed, and of the clerk, from whose custody they had been taken and to whose custody they were returned, and of the persons who assisted these officers, was taken to show that the ballots had not been tampered with so far as known to them. But how were the ballots kept? While in the custody of the sheriff, they were placed in the court room. At night the sheriff slept in an adjoining room, with the lights turned on, and the door open between that room and the court room. No less than six or eight keys to that court room were in the hands of other persons. Some of the keys were in the hands of unknown parties, so far as the testimony shows. The sheriff requested two persons to stay with him. One of them did stay during the fore part of one night, and the other during the after part of the same night. When the latter came to relieve the former, he found the outside door of the court room open. There was a balcony to the court room, accessible from a stairway leading from a hallway outside of the court room. From the balcony the court

room was accessible by rope or ladder, and a ladder was there. While in the custody of the clerk, the ballot box and ballots were kept in the vault of his office; but the vault was accessible to the public, and persons went there unattended by the clerk. The clerk was not in his office for some days at least, during which the custody of his office was in the hands of others. There is much evidence tending to show that the ballots were left open, lying on the table in the county court room, when the members of the board of canvassers were absent, and that a person or persons were seen in the room at the time.

We might detail all the evidence, but we deem it unnecessary to do so. When the evidence is considered, the proof of tampering is complete. The burden was on contestant to rebut the *prima facie* case of tampering presented by the appearance of the ballots. He has wholly failed to do so.

It is held in the last Stafford case that certificates of the result of the election, made by the commissioners of the precinct, are *prima facie* evidence of the result of the election. The ballots, if identified as the ballots cast, are primary and higher evidence; but, in order to continue the ballots as controlling evidence, it must appear that they have been preserved in the manner and by the officers prescribed by the statute, and that while in such custody they have not been changed or tampered with.

"Where, in an election contest, it appears that the ballots have been changed, or so exposed as to afford opportunity to be tampered with, or left in the custody of an officer or other person so personally interested in the result of the election as to be subject to the temptation or inducement to alter them, the presumption of their integrity is lost, and they are not to be accepted as evidence." *Hamilton* v. *Young*, 81 S. W. Rep. 682.

"It must affirmatively appear that they (the ballots) have been preserved with that jealous care which precludes the opportunity of being tampered with, or the suspicion of change, abstraction, or substitution." *Davenport* v. *Oelrich*, 104 Ia. 194. See, also, *Farrell* v. *Larsen*, 26 Utah 283; *DeLong* v. *Brown*, 113 Ia. 370; *Windes* v. *Nelson*, 60 S. W. Rep. 129; *Jeter* v. *Headly*, 186 Ill. 34; *Fenton* v. *Scott*, 17 Ore. 189.

We have before us the same case, in all essential particulars, upon which the board of canvassers was directed, in the last Stafford case, to take the certificate result of the commissioners holding the election at Matewan Precinct. The only difference is, that, instead of a *prima facie* case, we have a conclusive case of tampering with the ballots. It is true that this is a review of the judgment of a court of contest, clothed with full power to receive all proper evidence. It is also true that nearly all the ballots were signed by one of the poll clerks for both. It is contended that these ballots never could legally have been counted. This argument was as forcible when the Stafford case was decided, as now. These ballots are not void because the persons who cast them were not entitled to vote, but because the poll clerks failed to properly sign them. It must be borne in mind that we are laying down a rule not only for the case before us, but for all cases of like kind. In this case, probably a larger per cent. of the ballots were found to be improperly signed than will usually be found. It may be said that this was an extreme case of improper signing by a poll clerk. If only one ballot had been improperly signed by a poll clerk, the same rule must apply. Then, shall we say that one ballot signed by one poll clerk for both, coupled with proof of tampering, is sufficient to throw out the vote of a precinct, and to destroy the certificate return of an election made before the tampering occurred? Should the legal voters of a precinct be thus disfranchised, and their votes count for naught? We think, under the facts here appearing, as a general rule less harm will come from taking the certificate result, notwithstanding some one or more of the ballots are found to have been improperly signed by one of the poll clerks for both. To hold otherwise would give great power to the tamperer. All that would be necessary to throw out a poll would be to find one void ballot, and a case of tampering with the ballots. If ballots are improperly signed by one poll clerk for both, it is the duty of the commissioners of election to reject such ballots. If all the ballots are void the vote of the precinct may properly be rejected. Usually, we may expect this to be done. The commissioners of election are composed of persons belonging to different political parties; and we think that it is safer to rely upon their return,

than to place in the hands of the tamperer power to destroy the result of the election.

It may be urged that the Stafford case does not apply here, because the canvassing board was a ministerial body, and that a court of contest is judicial. While a board of canvassers is generally a ministerial body, yet it exercises *quasi* judicial functions as to some matters before it. In *Brazie* v. *Comrs.*, *supra*, Judge Snyder, delivering the opinion, says: "While the duties and powers of the commissioners are mainly ministerial, they are *quasi* judicial so far as it is their duty to determine whether the papers laid before them by the clerk, and purporting to be returns, are in fact such genuine, intelligible and substantially authenticated returns as are required by law. To the extent here indicated, a judgment in the nature of a judicial function is necessarily exercised; for if it be otherwise, the whole law is inoperative in respect to the power of the county commissioners to do any act whatever." To the same effect is *Dent* v. *Board*, 45 W. Va. 750. It will be observed that in the Stafford case this Court directed the board to receive the evidence of the poll clerks and commissioners of election, to show whether or not the ballots were void for want of signing by both poll clerks, and if it found them all void, to reject the precinct, but, if not all void, to compare them with the certificate return, and in case of disagreement to take the certificate. Under this mandate, the board exercised judicial, or *quasi* judicial, functions. It heard evidence, and determined from that evidence whether or not the ballots were void, and, not finding all ballots void, it compared them with the certificate return and determined that there was disagreement. These acts required the exercise of judicial determination. They were not merely ministerial. Under that decision, the canvassing board had as full judicial power to determine the void character of the ballots arising from failure of both poll clerks to sign the ballots, upon the evidence before it, as the court of contest had upon the evidence before it. We agree that the court of contest has a wider power to admit evidence; but if, after the evidence is admitted, it shows a case practically the same as that upon which the board of canvassers was directed upon the recount to take the certificate return, we think that the court of contest must do likewise. There is a change of forum, it is

true; but not a change of law. It cannot be said that one law as to void ballots prevails before the board of canvassers, and another before the court of contest. We feel bound by the decision in the Stafford case, not only because it is the decided law, but because we believe that it is the safer and better rule to take the certificate return under the facts presented in this case.

For the reasons stated, the final order of the circuit court in this case is reversed. Proceeding to enter such judgment as the circuit court should have entered, we declare, as the true result of the election held on the 8th day of November, 1904, for the office of sheriff of Mingo county, for the term beginning on the first day of January, 1905, that the contestee, E. E. Musick, received fourteen hundred and ten votes, and that the contestant, H. H. Williamson, received thirteen hundred votes, and that said contestee was elected to said office for said term.

*Reversed.*

POFFENBARGER, JUDGE (*dissenting*):

I think the powers of a court of contest are more ample than those of a board of canvassers, and that it is not bound or controlled by the decision of the canvassers on any question properly raised in the court of contest. A canvassing board has power only to count and declare the result of the count, and all the judicial power it has is simply such as is incident to the act of counting. When because of tampering it cannot count the ballots it must take the certified result, if there were any legal ballots cast. It has no power to throw out a ballot because it was cast by a person not entitled to vote, nor to decide against a candidate on the ground of ineligibility. And any decision it makes lacks finality. It only determines the *prima facie* right, and the final and absolute determination of the right is with the contest court, if the question be carried into that court.

The court of contest is armed with full judicial power. It is not limited to the mere matter of counting. If it can see clearly that a man is elected, without being able to specify the exact number of votes received, it has the judicial power to declare him elected. These candidates came to Matewan precinct with their respective votes standing as follows: Mu-

sick, 1070; Williamson, 1245, a majority of 175 votes for Williamson. It is an indisputable fact that only four valid ballots were east at Matewan.· Had Musick received all four of them he would still have lacked 171 of being even with Williamson. But this decision overcomes the difficulty by counting 411 void ballots, giving Musick 337 of them and Williamson 54, because, in view of the tampering, the court is unable to say just exactly how many votes each candidate received. What difference can that make when it is plainly impossible that Musick could be elected by legal ballots? How could the tampering put life and vigor into void ballots?· Rules declared by this and other courts in cases not at all similar to this constitute no obstacle to such a disposition of it, as I suggest.

Believing the court of contest has power to declare the result, in accordance with plainly apparent right, although unable under the rules of counting to specify the exact number· of votes received, I cannot concur in the decision. In these· views, JUDGE MCWHORTER concurs.