JAMES RICHARD BEVINS, *et al.*

*v.*

WILLIAM FRENCH BLACKBURN, JR.

(No. 10865)

Submitted January 9, 1957. Decided March 12, 1957.

*W. Graham Smith, Jr., E. Gaujot Bias, Harry W. Hill,* for plaintiffs in error.

*Slaven & Staker, Zane Grey Staker,* for defendant in error.

RILEY, PRESIDENT:

This proceeding was instituted under Code, 6-6-7, in the Circuit Court of Mingo County, by James Richard Bevins, Burgess William Lowe, Flavia W. Shelton, Lassie Hatfield, Lillie Ruth Crum, William P. Crum, Virginia E. Salton, Wharton V. Linkous, Earl W. White, Bertie C. Roach, Taylor V. Marcum, Lillie Marcum, Peggy Ann Herald, Maggie White, and Maude P. Dickinson, all residents and qualified voters in the Third Ward of the City of Williamson, four of whom are registered Republicans and eleven of whom are registered Demo-

crats, in which the petitioners seek to remove respondent, William French Blackburn, Jr., from the office of Councilman of and for said Third Ward in the City of Williamson, on the ground that respondent is not a resident of such ward, not a qualified voter therein, and, therefore, is not qualified to serve as Councilman for the Third Ward in the City of Williamson. To a final order of the circuit court, denying the prayer of the petition and dismissing the proceeding, this writ of error is prosecuted.

At the municipal primary election held in the City of Williamson on April 12, 1955, the respondent was nominated on the Democratic ticket for the office of Councilman for the Third Ward in a five-way race, at which primary election respondent received about twenty-eight per cent of the Democratic votes in the Third Ward, with a plurality of four votes over the second highest candidate in the primary. In the general election, held in the City of Williamson on June 14, 1955, the respondent, by a certificate of result of the election, issued by the City Council of Williamson, acting as a canvassing board, was declared elected as Councilman for the Third Ward for a term of three years, beginning July 1, 1955, on which date the respondent was sworn in as such councilman, and has since performed the duties of that office.

The respondent Blackburn first became domiciled in and a resident of the City of Williamson, in the year 1951, where, in the month of December, 1951, he registered to vote, which was his first registration to vote anywhere in the State of West Virginia.

It is alleged in the petition that respondent's first and only residence in the City of Williamson was located on Mulberry Street within the confines of the Second Ward of the City of Williamson; that the only business office which respondent has ever maintained in Williamson has always been in the Second Ward thereof; and that the first registration of respondent for voting was in Precinct No. 3, which is in the Second Ward of the City

of Williamson, in which is located the only home respondent has had in that city.

The petition further alleges that respondent voted in Precinct No. 3 in the Second Ward of the City of Williamson at the primary and general elections held in the months of April and June, 1952; and also voted at the same place in the primary and general State-County elections held in May and November, 1952.

In the petition it is further alleged that on April 28, 1954, the respondent, without changing his residence or address, and still living within the boundaries of the Second Ward of the City of Williamson and Precinct No. 3, transferred, or had transferred, his registration from Precinct No. 3 in the Second Ward to Precinct No. 6 in the Third Ward; and that since such transfer the respondent has been voting in said Precinct No. 6 in the Third Ward, the first and only municipal election wherein he cast his vote in said Third Ward being the municipal primary election, wherein he was a candidate as aforesaid for councilman in April, 1955.

The pertinent provisions of the special charter under which the City of Williamson is operated, as enacted by Chapter 136, Acts of the Legislature, Regular Session, 1933, and the sections of such charter which are pertinent to a decision in this case are as follows:

"Sec. 5. The municipal authorities of the city shall consist of a mayor and four councilmen, who shall constitute and be known as 'the council of the City of Williamson.' One councilman shall be elected by the voters of each of the respective wards and the mayor shall be elected at large.

\* \* \*

"Sec. 8. No person shall be eligible to hold the office of mayor, councilman, or any subordinate office, unless at the time of his election or apportionment he is legally entitled to vote in the city election for mayor and members of the council.

\* \* \*

"Sec. 11. Every citizen of this state, who has been a bona fide resident of the city for sixty days next preceding any city election, and who is otherwise legally entitled to vote under the constitution and laws of this state, and who has been duly registered as herein provided for, shall be entitled to vote at such city election at the precinct in which they respectively reside; but no person shall be deemed a resident of such city by reason of being stationed therein for any temporary purpose. * * *."

It is alleged in the petition, and the record before this Court discloses, that the boundary between the Second and Third Wards has been set by ordinance of the Council of the City of Williamson, as a result of which ordinance the boundary line runs near to or through the residence of the respondent, which the petition alleges is within the Second Ward of the City of Williamson and beyond the confines of the Third Ward thereof, which last-named ward the respondent, so the petition alleges, presumes to represent.

At a meeting of the Council of the City of Williamson, held on March 12, 1943, as shown by petitioners' "Exhibit G", which is a certified copy of an excerpt from the minutes of the meeting held on March 12, 1943, of record in Council Journal Book No. 6 of the City of Williamson, it appears that the council provided by ordinance for a change in the boundary lines of Wards Nos. 2, 3, and 4 of the City of Williamson, and ordered that the boundary lines thereof be altered and changed as follows:

"SECOND WARD.

\* \* \*

"Beginning at the intersection of Harvey Street & Tug River; then up Harvey Street with the center thereof to the intersection of Joseph Street; thence along Joseph Street with the center thereof to the intersection of Fairview Avenue; thence along Fairview Avenue with the center thereof crossing High Street and running on the Eastern side of the High Pressure Reservoir and the East side of the Water Plant to the

top of the ridge at the corporation line; thence with the corporation line around said ridge to the line of the First Ward, and with the Western line of the First Ward, it being the line between the lands of Williamson Mining Mfg. Co., and Lawson heirs, to Tug River; thence down Tug River to the place of beginning.

"THIRD WARD. * * Beginning at the intersection of Harvey Street and Tug River and running with the Western boundary lines of the Second Ward to Joseph Street; thence with the center of Joseph Street to the point where the same intersects with Fairview Avenue thence with the Western boundary of the Second Ward above described, to the top of the mountain; thence Westerly and with said top of the mountain to a point on the ridge and the corporation boundary line; thence in a Westerly direction and with said boundary line to a point due north of Graham Street; thence with Graham Street in a Southerly direction to the Norfolk & Western Railway tracks; thence along said railway tracks in a Westerly direction to a point located a short distance below or West of the plant of the Mingo Lime & Lumber Company; thence a straight line in a Southerly direction to Tug River; thence with Tug River to the point of beginning at the intersection of Harvey Street and said Tug River.

"FOURTH WARD. * * * Beginning at the corporation line at the intersection of Tug River and the line between the lands of Thomas Stepp and V. A. Williamson; thence running with the corporation line to the top of the ridge and with the ridge and corporation line to the boundary line of the Third Ward as hereinbefore described, and with the Western line of said Third Ward to Tug River; thence down Tug River to the place of beginning."

The current charter of the City of Williamson, contained in Chapter 136, Acts of the Legislature, Regular Session, 1933, amending and reenacting Chapter 15 of the Acts of the Legislature, 1905, as amended by Chapter 14 of the Acts of the Legislature, 1915, as amended by

Chapter 20, Acts of the Legislature, Regular Session, 1919, as amended by Chapter 4, Acts of the Legislature, Regular Session, 1927, as amended by Chapter 21, Acts of the Legislature, 1929, (Municipal Charters), provides in Section 2 thereof:

> "The corporate boundaries of the said city shall be as follows; that is to say: Beginning at the mouth of Sycamore creek; thence up said creek to the first left hand fork thereof; thence with the said left hand fork to the top of the ridge; thence up said ridge to the main ridge dividing the waters of Tug river and Buffalo creek, and with the latter ridge to a point on the dividing lines of the lands of the Williamson Mining and Manufacturing company and Thomas Stepp's estate; thence westward with said dividing lines to the lands of V. A. Williamson; thence with the lines dividing the lands of said V. A. Williamson and Thomas Stepp's estate to Tug river; thence up Tug river with the center thereof to the place of beginning."

Chapter 136 further provides in Section 3 thereof for the division of the City of Williamson into four wards and the boundaries thereof; and Section 4 thereof provides: "The council of the City of Williamson shall have the power and authority to change the boundary lines of the respective wards from time to time", upon publication of notice thereof in a newspaper published and of general circulation in the said City of Williamson.

Inasmuch as the ordinance of the Council of the City of Williamson of March 12, 1943, as shown by petitioners' "Exhibit G", provided for a change in the boundary lines of the Second, Third and Fourth Wards of the City of Williamson, which boundaries are hereinabove set fourth in detail, the descriptions of these wards in Chapter 136 are of no moment in the decision of this case.

Two engineers, who prepared maps purporting to show the boundary lines between the Second and Third Wards, testified. The map prepared by Lewis E. Linkous, a Registered Professional Engineer, a witness for

petitioners, shows the area of the City of Williamson from Joseph Street to Mulberry Street, and from Alderson Street to Zando Street, which map is dated April 3, 1956, and the other map, prepared by Rufus M. Reed (who signed the map under the name of "R. M. Reed"), a witness for respondent, dated April 6, 1956, both of which are filed as exhibits with this opinion, together with a map showing the layout of the City of Williamson and environs, in Mingo County, West Virginia, and Pike County, Kentucky, dated March, 1930, which maps show generally the lines between the Second and Third Wards in the City of Williamson, all of which were introduced in evidence, and photostatic copies of which are made a part of this opinion and attached hereto, marked, respectively, "Photostat No. 1", "Photostat No. 2", and "Photostat No. 3". In the Second Ward there is a precinct marked "Precinct No. 3", and in the Third Ward there is a precinct marked "Precinct No. 6". The line between precinct No. 3 and precinct No. 6 is the dividing line between the Second and Third Wards.

The question immediately before this Court is whether the respondent, William French Blackburn, Jr., is a resident of the Third Ward or the Second Ward in the City of Williamson.

From this record it appears that there is a diversity of opinion between the two engineers as to the location of the line which runs in a northerly direction up Fairview Avenue, thence across High Street in the City of Williamson on the eastern side of the water plant in the City of Williamson, which this record discloses is on High Street in the City of Williamson; thence along the division line between the wards to the east of the reservoir plant, which line is definitely the division line between the Second Ward and the Third Ward in the City of Williamson. The high pressure reservoir on the point on the eastern edge of the foundation, as described by Engineer Reed in his survey of April 6, 1956, discloses that the dwelling house of the respondent, William French Blackburn, Jr., is definitely in the Second Ward, except

for the cornice of his house which protrudes into the Third Ward.

In the examination of this record, this Court has taken notice that Engineer Linkous has superimposed the high pressure reservoir point on his map, showing the City of Williamson from Joseph Street to Mulberry Street and from Alderson Street to Zando Street, in order to determine the dividing line between the Second and Third Wards; whereas Engineer Reed, as shown by his map dated April 6, 1956, testified in the record in this case that he actually surveyed the high pressure point on the east edge of the foundation of that high pressure reservoir. In this regard this record clearly discloses that Engineer Reed made an actual survey in order to determine the eastern edge of the foundation of the high pressure reservoir.

As this case involves the question whether respondent, William French Blackburn, Jr., is a resident of the Second or of the Third Ward, and as the Circuit Court of Mingo County has dismissed the petition of the residents of the Third Ward, praying that William French Blackburn, Jr., be disqualified as a member of the Council of the City of Williamson and from serving as such Councilman in the Third Ward, it is the duty of this Court to say at this time that the line from Fairview Avenue past the water plant to the eastern end of the foundation of the high pressure reservoir at the top of the mountain, crossing as it does High Street and Mulberry Street, places the dwelling house of William French Blackburn, Jr., within the confines of the Second Ward of the City of Williamson, except that, viewing the evidence in the light most favorable to respondent, William French Blackburn, Jr., the line crosses the cornice of the house of the respondent, and no part of the living quarters of that house is within the Third Ward. According to Engineer Reed the line runs from the northeast corner of High and Mulberry Streets, S 46° 20' West 559.80 feet to the eastern edge of the foundation of the reservoir, which line places respon-

dent's house wholly within the confines of the Second Ward, and outside the Third Ward of the City of Williamson, except for the northwest cornice of respondent's house.

An examination of the plat prepared by Engineer Linkous, dated April 3, 1956, discloses that a line drawn and surveyed up Harvey Street and down Joseph Street, and thence up Fairview Avenue, past the eastern side of the water plant to the eastern side of the high pressure plant would entirely exclude the respondent, William French Blackburn, Jr., from residency in the Third Ward of the City of Williamson, and place his house completely in the Second Ward of the City of Williamson.

This Court, therefore, is of opinion that William French Blackburn, Jr., is a resident of the Second Ward of the City of Williamson, and is ineligible to vote in the Third Ward of the City of Williamson, and, by the same token, is not eligible to serve as Councilman in the Third Ward of the City of Williamson.

We say this, because we think that Sections 5, 8 and 11 of the current Charter of the City of Williamson, inasmuch as they relate to the qualification of voters and of the mayor and members of the Council of the City of Williamson, should be read in *pari materia,* and, being so read, a necessary qualification for Councilman in the City of Williamson is that he be an actual resident of the ward which he purports to represent in the council.

The fact that the registrars, Ruth E. Murphy and Myrtle Varney, registered respondent's wife in the Third Ward of the City of Wiliamson; and that the respondent thereafter changed his registration from the Second Ward to the Third Ward of the City of Wiliamson, is indicative there was no bad faith on the part of the respondent, William French Blackburn, Jr., in changing his registration from the Second to the Third Ward, and thereafter running and being elected as a member of the Council of the City of Williamson to represent the

MAP
SHOWING
AREA OF CITY OF WILLIAMSON W.VA.
FROM
JOSEPH STREET TO MULBERRY STREET.
FROM
ALDERSON STREET TO ZANDO STREET
APRIL 3rd 1936. LOWE C. LINKOUS R.P. ENGINEER.

JAMES RICHARD BEVINS
v
WILLIAM FRENCH BLACKBURN JR.

WARD THREE.    WARD TWO.

PHOTOSTAT NO. 1.

MAP SHOWING
SURVEY OF A
STRAIGHT LINE
FROM EASTERN SIDE OF
WATER PLANT PROPERTY
TO
HIGH PRESSURE RESERVOIR
ON POINT WITH RESPECT
TO PROPERTY OF
W. F. BLACKBURN
WILLIAMSON · W. VA.
SCALE 1" = 50'
APRIL 6, 1956
R. M. Reed.

PHOTOSTAT NO. 2.

MAP SHOWING LAYOUT
OF THE CITY OF
WILLIAMSON
AND ENVIRONS
MINGO COUNTY, W.VA. & PIKE COUNTY, KY.
COMPILED FROM
OFFICIAL RECORDS, ORIGINAL PLATS & ACTUAL SURVEYS
SCALE OF FEET
MARCH 1930
COMPILED IN OFFICE OF
DAVID M. GOOD & SON
CIVIL, MINING & CONSULTING
W. E. Good Del.   D. M. Good City Engr.
No. 1882-36

Third Ward. The provisions of the charter, in our opinion, however, properly interpreted, require that each Councilman of the City of Williamson shall be a voter of the ward which he represents, and his qualification as a voter in that ward is a condition precedent to his qualification to hold the office of Councilman in the City of Williamson, representing the ward in which he actually resides. This Court, though this record discloses no bad faith either on the part of William French Blackburn, Jr., his wife, Mackay Ann Blackburn, or the two registrars, Myrtle Varney and Ruth E. Murphy, nevertheless feels compelled to reverse the judgment of the Circuit Court of Mingo County in dismissing the petition, and remands this proceeding to that court with directions that the petition be reinstated by the circuit court and an order entered removing the respondent, William French Blackburn, Jr., as Councilman for the Third Ward of the City of Williamson, in accordance with the provisions of Code, 6-6-7.

The judgment of the Circuit Court of Mingo County is reversed, and this proceeding is remanded to the Circuit Court of Mingo County with directions to proceed in a manner consonant with the principles enunciated herein.

*Reversed and remanded*
*with directions.*

GIVEN, JUDGE, dissenting:

The controlling facts are easily understood. Respondent Blackburn, with his wife, moved to a dwelling on Mulberry Street, in the City of Williamson, in 1951. In accordance with information then deemed correct, he registered as a voter in precinct 3, ward 2, and voted in that precinct at several elections. In 1954, the duly appointed and qualified registrars, required by law to register the qualified voters in the precincts involved, visited the home of respondent in his absence and, after an independent investigation of the very matter here involved, required the wife of respondent to register as a voter in precinct 6 of ward 3. There is no question that

576

one of the lines separating precinct 3 and precinct 6 passes through the property of respondent. Subsequently, for the sole reason that the duly appointed registrars had required his wife to register in precinct 6, respondent caused his registration to be transferred from precinct 3 to precinct 6. The transfer was actually made by officers duly appointed and qualified for that purpose. The transfer was not challenged or in any way objected to until long after respondent had been elected as councilman for the city. Neither does the record show that the vote of respondent was challenged in the election at which he was elected. Respondent duly qualified for the office to which he was elected and, at the time of the entry of the order removing him from office, had served more than one half of the term for which he was elected.

The only basis for the removal of respondent from the office to which he was elected rests on the supposed fact that he was not entitled to vote because he was not properly registered as a voter of precinct 6 of ward 3. That fact is merely assumed by the majority, not even discussed in the majority opinion, on the basis of a final determination of the line dividing precinct 6 from precinct 3. I think that such basis does not constitute the controlling — not even a material — fact in the case. The record unequivocally shows that the question as to which precinct respondent was entitled to vote at in the particular election was determined and settled by properly constituted authority before the election, and that respondent was unquestionably "entitled to vote", and did vote without challenge, at precinct 6 in the election at which he was elected. What might be determined subsequently as to the true location of the dividing line, should not be permitted to invalidate a prior election duly and regularly held, precisely as provided by law.

Article 2 of Chapter 3 of the Code provides a permanent and uniform registration system for all elections within the State. Section 3 of that article, as amended, provides: "No voter otherwise qualified shall be permitted to vote at any election unless he shall have been

duly registered or shall have placed himself within the 'challenged voters' provision of this chapter." Clearly, by this section the Legislature intended that all persons registered as required by statute should be "entitled" to vote, some, perhaps, by "challenged" vote, but vote nevertheless. Section 16 provides for the appointment and qualification of registrars. One of the requirements provided is that a registrar "shall take an oath that he will perform the duties of the office to the best of his ability", and one of the specific requirements is that he "shall determine whether or not such person" is entitled to register. Section 17 makes provision as to compensation of registrars. Section 32 provides that "Any person claiming the right to register may be challenged by the clerk of the county court or by any registrar, or, provided they appear in person at the office of the clerk of the county court, by the chairman of a political party or any other qualified voter"; and Section 37 provides for hearings of questions raised as to the registration of any voter by the county court, for appeals from rulings of the county court to the circuit court, and from the circuit court to the Supreme Court of Appeals. In view of such comprehensive and precise method provided by the Legislature for the determination of any question as to whether a particular citizen is "entitled to vote" at a particular election, and since, in the instant case, the duly appointed registrars were public officials, duly qualified and serving, and compensated from public funds, according to law, it is unequivocally clear that the respondent was entitled to cast his vote at precinct 6 at the election at which he was elected. The "determination" of the right of respondent to vote at that precinct in that election, by regularly constituted authority, having not been challenged in any manner within the time provided by statute, it should be respected. Even though the pertinent provisions of the special charter, quoted in the majority opinion, are construed to be in conflict with provisions of the permanent registration law, it should not, in effect, be permitted to supersede or nullify provisions of the legislative enactment. Moreover, the per-

manent registration law, in effect at the time respondent was elected, was enacted subsequent to the act constituting the special charter.

In my view, the exact point here involved was settled, settled so firmly that it has not since been raised in this Court, in *Phares* v. *The State,* 3 W. Va. 567. In that case a rule was issued against Phares, requiring him to show cause why he should not be removed from the office of Sheriff of Randolph County, on allegations to the effect that he was not a properly registered voter. As did respondent in this case, after his election Phares duly qualified for the office to which he had been elected. After his election and qualification, the "board of registration of the county having certified to the circuit court that he was not entitled to vote", the Circuit Court of Randolph County removed him from office. This Court reversed the judgment of the circuit court and reinstated Phares as Sheriff of Randolph County. After noting that evidence, offered for the purpose of showing that Phares was not entitled to vote, was inadmissible, this Court stated: "* * * But the most material and important error in the case was in depriving an officer of his office, because of the fact alleged, to wit: that his name had, by order of the board of registration, been striken from the list of registered voters of the county, even if the fact had been legally made to appear.

"The constitution prescribes who are entitled to vote, and it also provides that any person so entitled to vote shall be eligible to office. The defendant possessed all the qualifications required by the constitution and laws to vote and hold office at the time he was elected and qualified as sheriff for Randolph county * * *". Clearly, the holding is to the effect that where a candidate for office was duly registered at the time of his election, the striking of his name from the registration list subsequent to the election, though evidence established that the officer was not entitled to register, would not preclude the person from qualifying for and serving in the office to which he was elected. The same constitutional

provision governing in that case should govern in the instant case.

As above noticed, the only possible basis for the removal of respondent from office was the contention that he was not "entitled" to vote at the election at which he was elected. Code, 3-2-3, quoted above, makes it unquestionably clear that persons who have registered in accordance with the permanent registration law shall have the right to exercise the privilege of voting, though in some possible cases by "challenged" vote. Being thus "entitled" to vote, respondent, in my opinion, brings himself within the required qualifications. Ample authority is found to the effect that courts will not deny a citizen the right to vote, or to have his vote counted, merely because of some mistake or wrong committed by election officials, such as registrars. The same principle is applicable to the holding of office. In *Williamson* v. *Musick*, 60 W. Va. 59, 53 S. E. 706, this Court held: "5. As a general rule, when the true result of a legal election has been ascertained, or can be ascertained, by the officers charged with the performance of the duty, no irregularity, mistake, or even fraud, committed by any of the officers conducting the election, or by any other person, will render the election void." In the instant case, no fraud or bad faith on the part of respondent or other person is even intimated. Admitting that the registrars, public "officers", may have made a mistake as to the precinct in which respondent was a resident, under the holding quoted and many others which could be cited, the mistake of public officers should not be made the basis for declaring void the election as to respondent, thereby effectually disfranchising a majority of the voters of the entire ward. Such a holding would be contrary to reason and justice, and not in accord with the prior holdings of this Court. No person, of course, is entitled to vote or to hold office unless his qualifications are those demanded by the Constitution. The right of a person to hold office when elected or appointed thereto, however, is a right which should be protected by law.

**580**

See *Simms* v. *County Court of Kanawha County,* 134 W. Va. 867, 61 S. E. 2d 849; *State ex rel. Lawhead* v. *County Court of Kanawha County,* 129 W. Va. 167, 38 S. E. 2d 897; *Brannon* v. *Perkey,* 127 W. Va. 103, 31 S. E. 2d 898; *Funkhouser* v. *Landfried,* 124 W. Va. 654, 22 S. E. 2d 353.

Being of the views indicated, I respectfully dissent. I am authorized to say that Browning, Judge, concurs in the views herein expressed. We would affirm the judgment of the Circuit Court of Mingo County.